UNITED STATES *v.* LOCAL 807 OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN & HELPERS OF AMERICA ET AL.*

No. 131. Argued January 7, 1942.—Decided March 2, 1942.

*Together with No. 132, *Local 807 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America et al.* v. *United States,* also on writ of certiorari, 314 U. S. 596, to the Circuit Court of Appeals for the Second Circuit.

*Assistant Attorney General Arnold,* with whom *Solicitor General Fahy* and *Messrs. Richard H. Demuth* and *Charles H. Weston* were on the brief, for the United States.

*Mr. Louis B. Boudin,* with whom *Messrs. Edward C. Maguire* and *James D. C. Murray* were on the brief, for Local 807 of International Brotherhood of Teamsters, etc., et al.; and *Messrs. James D. C. Murray* and *Edward C. Maguire* submitted for William Campbell et al.—respondents in No. 131 and petitioners in No. 132.

MR. JUSTICE BYRNES delivered the opinion of the Court.

This case comes here on cross-petitions for certiorari to review a judgment of the Circuit Court of Appeals reversing the conviction of Local 807 and 26 individuals on charges of conspiracy to violate §§ 2 (a), 2 (b) and 2 (c) of the Anti-racketeering Act of June 18, 1934.[1] The

---

[1] 48 Stat. 979, U. S. C., Title 18, § 420 (a). Local 807 and the 26 individuals were also convicted of conspiracy to violate § 1 of the Sherman Act (26 Stat. 209, U. S. C. Title 15, § 1). The Circuit Court of Appeals reversed the convictions under this indictment as well, but the Government does not seek review of this part of its judgment.

Government asks that the judgments of conviction be reinstated. In their cross-petition the defendants seek dismissal of the indictment. We do not regard this as a correct disposition of the case. Since the correctness of the views concerning the meaning of the statute on which the trial court submitted the case to the jury goes to the root of the convictions and their reversal by the Circuit Court of Appeals, we shall confine our consideration of these cases to that issue. Consequently, we are concerned only with whether the defendants were tried in a manner consistent with the proper meaning and scope of the pertinent provisions of § 2 of the Act, which provide:

"Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b); . . ."

The proof at the trial showed that the defendant Local 807 includes in its membership nearly all the motor truck drivers and helpers in the city of New York, and that during the period covered by the indictment defendants Campbell and Furey held office in the Local as delegates in charge of the west side of Manhattan and the other de-

fendants were members. Large quantities of the merchandise which goes into the city from neighboring states are transported in "over-the-road" trucks, which are usually manned by drivers and helpers who reside in the localities from which the shipments are made and who are consequently not members of Local 807. Prior to the events covered by this indictment, it appears to have been customary for these out-of-state drivers to make deliveries to the warehouses of consignees in New York and then to pick up other merchandise from New York shippers for delivery on the return trip to consignees in the surrounding states.

There was sufficient evidence to warrant a finding that the defendants conspired to use and did use violence and threats to obtain from the owners of these "over-the-road" trucks $9.42 for each large truck and $8.41 for each small truck entering the city. These amounts were the regular union rates for a day's work of driving and unloading. There was proof that in some cases the out-of-state driver was compelled to drive the truck to a point close to the city limits and there to turn it over to one or more of the defendants. These defendants would then drive the truck to its destination, do the unloading, pick up the merchandise for the return trip and surrender the truck to the out-of-state driver at the point where they had taken it over. In other cases, according to the testimony, the money was demanded and obtained, but the owners or drivers rejected the offers of the defendants to do or help with the driving or unloading. And in several cases the jury could have found that the defendants either failed to offer to work, or refused to work for the money when asked to do so. Eventually many of the owners signed contracts with Local 807 under whose terms the defendants were to do the driving and unloading within the city and to receive regular union rates for the work. No serious question is raised by the evidence

as to the ability of the defendants to perform the labor involved in these operations.

The first count of the indictment was based upon § 2 (a) of the Act and charged a conspiracy "to obtain the payment of money . . . [from the owners] by the use of, attempt to use and threat to use, force, violence and coercion." The second count accused the defendants of conspiring to obtain the property of the owners "with their consent induced by wrongful use of force and of fear," in violation of § 2 (b). The third and fourth counts alleged a conspiracy to violate § 2 (c), in that the defendants agreed "to commit and threatened to commit acts of physical violence and of physical injury to the persons and property" of their victims, in furtherance of the general scheme to violate §§ 2 (a) and 2 (b). Local 807 and all of the individual defendants were convicted on the first count; the Local and 17 individuals on the second; and the Local and 11 individuals on the third and fourth.

The question in the case concerns that portion of § 2 (a) which excepts from punishment any person who "obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, . . . the payment of wages by a bona-fide employer to a bona-fide employee." [2] The Circuit Court of Appeals reversed because it believed that the trial court had failed to instruct the jury properly with respect to this exception.

To ascertain the limits of the exception is a difficult undertaking. Always assuming the presence of violence and threats, as we must in the face of this record, three interpretations of varying restrictive force require consideration: (1) The exception applies only to a defendant

[2] This exception does not appear in § 2 (b). But we agree with the Circuit Court of Appeals that it too is subject to the exception. The trial judge's instructions show that he shared this view. And the definition of terms in § 3 (b) was apparently intended to achieve this result.

who has enjoyed the status of a bona fide employee prior to the time at which he obtains or attempts to obtain the payment of money by the owner. (2) Assuming that this is incorrect and that the exception may affect a defendant who has not been a bona fide employee prior to the time in question, it does not apply if the owner's intention in making the payment is to buy "protection" and not to buy service, even though the defendant may intend to perform the service or may actually perform it. We understand this to be the position adopted by the Government in its brief and argument in this Court. (3) Assuming that both (1) and (2) are incorrect, the exception is not applicable to a defendant who obtains the payment of money if the owner rejects his genuine offer of service. We understand this to be the theory of the dissenting judge below.

Confronted with these various interpretations, we turn for guidance to the legislative history of the statute. Pursuant to a Senate Resolution of May 8, 1933,[3] a sub-committee of the Senate Committee on Interstate Commerce which became known as the Copeland Committee, undertook an investigation of "rackets" and "racketeering" in the United States. After conducting hearings in several large cities, the committee introduced 13 bills, of which S. 2248 was one.[4] As introduced, as reported by the Senate Judiciary Committee,[5] and as passed without debate by the Senate,[6] S. 2248 embodied very general prohibi-

---

[3] S. Res. 74, 73d Cong., 1st Sess.

[4] See 78 Cong. Rec. 457, 73d Cong., 2d Sess.

[5] S. Rep. No. 532, 73d Cong., 2d Sess. The report included a memorandum from the Department of Justice in which it was stated: "The provisions of the proposed statute are limited so as not to include the usual activities of capitalistic combinations, bona fide labor unions, and ordinary business practices which are not accompanied by manifestations of racketeering."

[6] 78 Cong. Rec. 5735, 73d Cong., 2d Sess.

tions against violence or coercion in connection with interstate commerce and contained no specific mention of wages or labor. After the bill had passed the Senate, however, representatives of the American Federation of Labor expressed fear that the bill in its then form might result in serious injury to labor,[7] and the measure was redrafted by officials of the Department of Justice after conferences with the President of the Federation. In the course of this revision, the bill assumed substantially the form in which it was eventually enacted. In particular, the exception concerning "the payment of wages by a bona-fide employer to a bona-fide employee" was added, and a proviso preserving "the rights of bona-fide labor organizations" was incorporated in what became § 6 of the Act as finally passed.[8] In its favorable reports on this revised bill,[9] the House Committee on the Judiciary set forth without comment a letter from the Attorney General to the Committee, dated May 18, 1934. In this letter the Attorney General informed the Committee that the draft of the substitute bill had been "definitely approved" by the President of the American Federation of Labor and his counsel. The letter continued:

"We believe that the bill in this form will accomplish the purposes of such legislation and at the same time meet the objections made to the original bill.

"The original bill was susceptible to the objection that it might include within the prohibition the legitimate and bona fide activities of employers and employees. As the

[7] 78 Cong. Rec. 5859, 73d Cong., 2d Sess.

[8] *"Provided,* That no court of the United States shall construe or apply any of the provisions of this Act in such manner as to impair, diminish, or in any manner affect the rights of bona-fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States." U. S. C., Title 18, § 420 (d).

[9] H. Rep. No. 1833, 73d Cong., 2d Sess.

purpose of the legislation is not to interfere with such legitimate activities but rather to set up severe penalties for racketeering by violence, extortion, or coercion, which affects interstate commerce, it seems advisable to definitely exclude such legitimate activities.

"As the typical racketeering activities affecting interstate commerce are those in connection with price fixing and economic extortion directed by professional gangsters, we have inserted subparagraphs (a) and (b), making such activities unlawful when accompanied by violence and affecting interstate commerce."

The substitute was agreed to by both the House and Senate without debate, when assurances were given that the approval of organized labor had been obtained.[10] Thereafter, while the bill awaited the signature of the President, Senator Copeland submitted a report[11] in which he referred to S. 2248 as one of eleven bills which had been enacted "to close gaps in existing Federal laws and to render more difficult the activities of predatory criminal gangs of the Kelly and Dillinger types."

This account of the legislative proceedings obviously does not provide specific definition of "wages," "bona-fide employer," or "bona-fide employee," as those terms are used in § 2 (a). But it does contain clear declarations by the head of the Department which drafted the section and by the sponsor of the bill in Congress, first, that the elimination of terroristic activities by professional gangsters was the aim of the statute, and second, that no interference with traditional labor union activities was intended.

It may be true that professional rackets have sometimes assumed the guise of labor unions, and, as the Circuit Court of Appeals observed, that they may have

---

[10] 78 Cong. Rec. 10867, 11402–11403, 11482, 73d Cong., 2d Sess.

[11] S. Rep. No. 1440, 73d Cong., 2d Sess.

"covered their practices by the pretence that the tribute collected was pay for services rendered." And it may also be true that labor organizations of good repute and honest purpose can be misdirected and become agencies of blackmail. Nevertheless, Congress plainly attempted to distinguish militant labor activity from the other and to afford it ample protection. With this legislative purpose uppermost in mind, we return to test the three theories of interpretation of § 2 (a) to which we have referred.

(1) We hold that the exemption is not restricted to a defendant who has attained the status of an employee prior to the time at which he obtains or attempts or conspires to obtain the money. In the first place, we agree with the observation of the court below that "practically always the crux of a labor dispute is who shall get the job, and what the terms shall be . . ." To exclude this entire class of disputes from the protection of the exception would be unjustifiably to thwart the purpose of Congress as we understand it. In the second place, the structure and language of § 2 (a) itself is persuasive against so narrow an interpretation. It does not except *"a bona fide employee* who obtains or attempts to obtain the payment of wages from a bona-fide employer." Rather, it excepts *"any person* who . . . obtains or attempts to obtain . . . the payment of wages from a bona-fide employer to a bona fide employee." Certainly, an outsider who "attempts" unsuccessfully by violent means to achieve the status of an employee and to secure wages for services falls within the exception. And where, as here, the offense charged is conspiracy to violate the section, the defendants are entitled to immunity if their objective is to become bona fide employees and to obtain wages in that capacity, even though they may fail of their purpose.

(2) The Government contends, as we have said, that the test is "whether, under all the circumstances, it ap-

pears that the money has been paid for labor or for protection." If the defendants do not offer to work, or if they refuse to work, or if their offer to work is rejected by the owners, the Government argues that any payment made to them must be for protection rather than for services. And even if the defendants actually perform some work, it is said, this circumstance should be regarded as relevant but not controlling in determining "the one crucial issue in every case such as this—namely, whether the money was paid for labor or for protection."

We take this to mean that the intent of the owners in making the payment is to be regarded as controlling. We cannot agree. The state of mind of the truck owners cannot be decisive of the guilt of these defendants. On the contrary, their guilt is determined by whether or not their purpose and objective was to obtain "the payment of wages by a bona-fide employer to a bona-fide employee." And, of course, where the defendants are charged with conspiracy as they were here, it is particularly obvious that the nature of their plan and agreement is the crux of the case. The mischief of a contrary theory is nowhere better illustrated than in industrial controversies. For example, the members of a labor union may decide that they are entitled to the jobs in their trade in a particular area. They may agree to attempt to obtain contracts to do the work at the union wage scale. They may obtain the contracts, do the work, and receive the money. Certainly Congress intended that these activities should be excepted from the prohibitions of this particular Act, even though the agreement may have contemplated the use of violence. But it is always an open question whether the employers' capitulation to the demands of the union is prompted by a desire to obtain services or to avoid further injury or both. To make a fine or prison sentence for the union and its members contingent upon a finding by the jury

that one motive or the other dominated the employers' decision would be a distortion of the legislative purpose.

We are told, however, that under this view such a common law offense as robbery would become an innocent pastime, inasmuch as it is an essential element of that crime that the victim be moved by fear of violence when he parts with his money or property. This objection mistakes the significance of this requirement of proof in the case of robbery. Its true significance is that it places an added burden upon the prosecutor rather than upon the accused. That is, the prosecutor must first establish a criminal intent upon the part of the defendant and he must then make a further showing with respect to the victim's state of mind. The effect of this rule is to render conviction of robbery more, rather than less, difficult. There is no such restrictive evidentiary requirement in prosecutions under this Act. If the objective that these defendants sought to attain by the use of force and threats is not the objective to which the exception in § 2 (a) affords immunity, they are guilty and nothing further need be shown concerning the actual motive of the owners in handing over the money. On the other hand, if their objective did enjoy the protection of that exception, they are innocent and their innocence is not affected by the state of mind of the owners. We shall consider in a moment, in point (3) below, the legal consequences which flow from the owners' actual rejection of proffered services. But it needs to be emphasized here that for the owners to reject an offer of services amounts to an overt act on their part. It is conduct or behavior as distinct from intention or state of mind. It is an event which alters the external situation in which the defendants find themselves. The latter must then decide whether they will continue to push their demands for the money. Whether or not they are guilty of an offense under this

Act if they choose to do so we shall presently discuss. But that decision must be made in terms of their motives and purposes and objectives rather than those of the owners.

We do not mean that an offer to work or even the actual performance of some services necessarily entitles one to immunity under the exception. A jury might of course find that such an offer or performance was no more than a sham to disguise an actual intention to extort and to blackmail. But the inquiry must nevertheless be directed to whether this was the purpose of the accused or whether they honestly intended to obtain a chance to work for a wage.

(3) There remains to be considered the difficult issue which divided the court below. The whole court agreed that the payment of money to one who refuses to perform the services is not "the payment of wages by a bona-fide employer to a bona-fide employee," within the meaning of § 2 (a); it also agreed that payments to one who has been permitted actually to perform the services do fall within the exception. But it divided over the question whether the payment of money to one whose sincere offer to work is rejected constitutes the payment of "wages" to a "bona-fide employee." Since the offence charged here is conspiracy, these questions must be put somewhat differently. Thus, there is no conspiracy to violate the Act if the purpose of the defendants is actually to perform the services in return for the money, but there is a punishable conspiracy if their plan is to obtain money without doing the work. The doubtful case arises where the defendants agree to tender their services in good faith to an employer and to work if he accepts their offer, but agree further that the protection of their trade union interests requires that he should pay an amount equivalent to the prevailing union wage even if he rejects their proffered services.

We think that such an agreement is covered by the exception. The terms "wages," "bona-fide employee" and "bona-fide employer" are susceptible of more than one meaning, and the background and legislative history of this Act require that they be broadly defined. We have expressed our belief that Congress intended to leave unaffected the ordinary activities of labor unions. The proviso in § 6 safeguarding "the rights of bona-fide labor organizations in lawfully carrying out the legitimate objects thereof," although obscure indeed, strengthens us somewhat in that opinion.[12] The test must therefore be whether the particular activity was among or is akin to labor union activities with which Congress must be taken to have been familiar when this measure was enacted. Accepting payments even where services are refused is such an activity. The Circuit Court has referred to the "stand-by" orchestra device, by which a union local requires that its members be substituted for visiting musicians, or, if the producer or conductor insists upon using his own musicians, that the members of the local be paid the sums which they would have earned had they performed. That similar devices are employed in other trades is well known. It is admitted here that the stand-by musician has a "job" even though he renders no actual service. There can be no question that he demands the payment of money regardless of the management's willingness to accept his labor. If, as it is agreed, the musician would escape punishment under this Act even though he obtained his "stand-by job" by force or threats, it is certainly difficult to see how a teamster could be punished for engaging in the same practice. It is not our province either to approve or disapprove such tactics. But we do believe that they are not "the activities of

---

[12] See note 8, *supra.*

predatory criminal gangs of the Kelly and Dillinger types" at which the Act was aimed, and that on the contrary they are among those practices of labor unions which were intended to remain beyond its ban.

This does not mean that such activities are beyond the reach of federal legislative control. Nor does it mean that they need go unpunished. The power of state and local authorities to punish acts of violence is beyond question. It is not diminished or affected by the circumstance that the violence may be the outgrowth of a labor dispute. The use of violence disclosed by this record is plainly subject to the ordinary criminal law.

As we have said, the evidence with respect to the crucial issues was conflicting. Thus, the jury might have believed that in some instances the defendants refused to do any driving or unloading when requested to do so, that in other cases they did not offer to work, that in other cases their offers were rejected, and that in still other cases they actually did some or all of the driving and unloading. In the early stages, written contracts were not in existence; later, a number of the owners signed contracts and the defendants performed the services for which they called.

The jury's task was difficult. The trial lasted six weeks. The jury required two days in which to reach a verdict, and twice during that period it sought further instructions from the court, particularly with reference to the law relating to labor activity. In such circumstances, where acts of violence naturally would influence the minds of the jury, the instructions were of vital importance, especially as they affected the question of whether the payments which the defendants conspired to obtain fell within the exception contained in § 2 (a). The trial judge made a number of statements which were

relevant to this issue, but we agree with the Circuit Court that the following were decisive:

"If the jury find that the sums of money paid by the truck operators were not wages so paid in return for services performed by such defendants, but were payments made by the operators in order to induce the defendants to refrain from interfering unlawfully with the operation of their trucks, then the sums in question may not be regarded as wages paid by a bona fide employer to a bona fide employee.

"The fact that any defendant may have done some work on a truck of an operator is not conclusive as to whether payments received by such defendants were wages; the jury may consider the performance of work by a defendant as evidence of the nature of the relationship between the defendant and the operator as establishing the status of a bona fide employer and a bona fide employee. If, however, what the operator was paying for was not labor performed but merely for protection from interference by the defendants with the operation of operator's trucks, the fact that a defendant may have done some work on an operator's truck is not conclusive."

These instructions embody the rule for which the Government contends, and which we think is erroneous for the reasons we have given. Under them the jury was free to return a verdict of guilty if it found that the motive of the owners in making the payments was to prevent further damage and injury rather than to secure the services of the defendants. Whether or not the defendants were guilty of conspiracy thus became contingent upon the purposes of others and not upon their own aims and objectives. Moreover, the charge failed correctly to explain the legal consequences of proof that the owners had rejected bona fide offers by the defendants to perform

the services. As we have said, the jury was bound to acquit the defendants if it found that their objective and purpose was to obtain by the use or threat of violence the chance to work for the money but to accept the money even if the employers refused to permit them to work. While the 48th, 49th and 58th instructions requested by the defendants, all of which were refused, do not constitute a complete exposition of the rules which we regard as applicable to this case, they cover a good deal of the ground and should have been granted. The 48th states that "it is not an offense under the Anti-Racketeering Act for anyone to obtain employment by the use or threat of violence if the intention is to actually work for the pay received, and to give an honest day's work for a day's wage." The 49th declared that "it is not the purpose of the Anti-Racketeering Act to prevent labor unions from attempting to obtain employment for their members, . . . and that the use of violence or the threat of violence for such purposes, while punishable under the laws, is not punishable under the Anti-Racketeering Act." The 58th requested charge read as follows:

"I charge you that in order that the defendants herein may be convicted under any one of the four counts of the Anti-Racketeering indictment, you must find a conspiracy under such counts; and that in order to sustain the charge of conspiracy under any one of the counts under the Anti-Racketeering indictment, the proof must show not only that individual defendants obtained money without rendering adequate service, but that it was the aim and object of the conspiracy that . . . [they]¹³ should obtain money without rendering adequate service therefor."

---

¹³ The words "all of the conspirators," rather than "they," appeared in the requested instruction as submitted to the trial judge. We think that as so expressed the charge would have been erroneous, but that with this change it states the correct rule.

Since the instructions denied, and the misleading instructions actually given, go to what is indeed the heart of the case, we hold that the convictions cannot stand and that the judgment of the Circuit Court of Appeals must be

*Affirmed.*

MR. JUSTICE ROBERTS and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE STONE, dissenting:

I think the judgment should be reversed, and the convictions affirmed, subject only to an examination of the sufficiency of the evidence as to some of the respondents, and to a consideration of whether the union itself is a "person" within the meaning of the statute.

Respondents, who are members of a labor union, were convicted of conspiracy to violate the Anti-Racketeering Act. They, or some of them, lay in wait for trucks passing from New Jersey to New York, forced their way onto the trucks, and by beating or threats of beating the drivers procured payments to themselves from the drivers or their employers of a sum of money for each truck, $9.42 for a large truck and $8.41 for a small one, said to be the equivalent of the union wage scale for a day's work. In some instances they assisted or offered to assist in unloading the trucks; and in others they disappeared as soon as the money was paid, without rendering or offering to render any service.

The Anti-Racketeering Act condemns the obtaining or conspiracy to obtain the payment of money or delivery of property by "the use of . . . force, violence, or coercion . . ." To this definition of the offense Congress added two—and only two—qualifications. It does not embrace the "payment of wages by a bona fide employer to a bona fide employee," and the provisions of the Act are

540

not to be applied so as to "affect the rights of bona fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States."

There is abundant evidence in the record from which the jury could have concluded that respondents, or some of them, conspired to compel by force and violence the truck drivers or their employers to pay the sums of money to respondents or some of them; that the payments were made by the drivers or truck owners to purchase immunity from the violence of respondents and for no other reason; and that this was the end knowingly sought by respondents.

I can only conclude that such conduct accompanied by such a purpose constitutes a violation of the statute even though the defendants stood ready to unload the trucks in the event that they were hired to do so. Unless the language of the statute is to be disregarded, one who has rejected the proffered service and pays money only in order to purchase immunity from violence is not a bona fide employer and is not paying the extorted money as wages. The character of what the drivers or owners did and intended to do—pay money to avoid a beating—was not altered by the willingness of the payee to accept as wages for services rendered what he in fact intentionally exacted from the driver or owner as the purchase price of immunity from assault, and what he intended so to exact whether the proffered services were accepted or not. It is no answer to say that the guilt of a defendant is personal and cannot be made to depend upon the acts and intention of another. Such an answer if valid would render common law robbery an innocent pastime. For there can be no robbery unless the purpose of the victim in handing over the money is to avoid force. Precisely as under the present statute, the

robber's use of force and its intended effect on the victim are essential elements of the crime both of which the prosecutor must prove. Under this statute when both are present the crime is complete, irrespective of other motives which may actuate the offender, if he is also aware, as we must take it the jury found, that the money is not in fact paid as wages by a bona fide employer. It is a contradiction in terms to say that the payment of money forcibly extorted by a payee who is in any case a lawbreaker, and paid only to secure immunity from violence, without establishment of an employment relationship or the rendering of services, is a good faith payment or receipt of wages.

Even though the procuring of jobs by violence is not within the Act, and though this includes the "stand-by" job where no actual service is rendered, the granted immunity, unless its words be disregarded, does not extend to the case where the immediate objective is to force the payment of money regardless of the victim's willingness to accept and treat the extortioner as an employee. It was for the jury to say whether such was the objective of respondents and whether they were aware that the money was paid because of their violence and not as wages.

When the Anti-Racketeering Act was under consideration by Congress, no member of Congress and no labor leader had the temerity to suggest that such payments, made only to secure immunity from violence and intentionally compelled by assault and battery, could be regarded as the payment of "wages by a bona fide employer" or that the compulsion of such payments is a legitimate object of a labor union, or was ever made so by any statute of the United States. I am unable to concur in that suggestion now. It follows that all the defendants who conspired to compel such payments by force and violence, regardless of the willingness of the

victims to accept them as employees, were rightly convicted.

If I am right in this conclusion, there was no error in the instructions to the jury. All the counts of the indictment were for conspiracy to violate the statute. The jury was told that to convict it must find conspiracy or agreement by respondents to violate the statute and that they must have the purpose or intention to commit the crime which it defined. As I have said, the intention to commit the offense includes the intention to use force and violence on the victim and the intention that the victim shall pay because of it. The jury was then instructed that the offense defined by the statute was the obtaining of money or property by force and violence but that "the jury may not find the defendants guilty on any count of the Anti-Racketeering Act indictment if the money which they are charged with having obtained from truck owners through the use of force and violence or threats of force and violence was paid as wages, and if the defendants who received the money were bona fide employees and the truck operators who paid the money were bona fide employers . . . If the jury find that the sums of money paid by the truck operators were not wages so paid in return for services performed by such defendants, but were payments made by the operators in order to induce the defendants to refrain from interfering unlawfully with the operation of their trucks, then the sums in question may not be regarded as wages paid by a bona fide employer to a bona fide employee . . . If, however, what the operator was paying for was not labor performed but merely for protection from interference by the defendants with the operation of the operator's trucks, the fact that a defendant may have done some work on an operator's truck is not conclusive."

Respondents' 48th and 49th requests were rightly refused. So far as they involved a ruling that the obtaining

of employment by force and violence does not constitute the offense, the court had already ruled specifically that there could be no substantive offense unless the payment of money or property had been obtained by force. But, in any case, both requests were erroneous because they made respondents' willingness to work the test of guilt, regardless of the intended and actual effect of the violence on the victims in compelling them to pay the money not as wages but in order to secure immunity from assault. The first part of the 58th request likewise had already been charged. The rest was plainly defective, since it required an acquittal unless it was the aim and object of the conspiracy that "all of the conspirators should obtain money without rendering adequate service therefor." Upon any theory of the meaning of the statute, it was not necessary for the Government to show that it was the object of the conspiracy that "all the conspirators" should receive payments of money. They would be equally guilty if they had conspired to procure the payments to some.