**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Theodore CALDES and Wellaine M.
Lowery, Defendants-Appellants.**

**No. 71-2261.**

United States Court of Appeals,
Ninth Circuit.

Feb. 10, 1972.

George Kaufmann (argued), Washington, D. C., Michael E. Benchoff, Phoenix, Ariz., for defendants-appellants.

Charles C. Ruff, Dept. of Justice, Washington, D. C. (argued), Richard K. Burke, U. S. Atty., Phoenix, for plaintiff-appellee.

Before JERTBERG and WRIGHT, Circuit Judges, and WILLIAMS, District Judge.*

DAVID W. WILLIAMS, District Judge:

Defendants were indicted in the District Court of Arizona and charged in a two count indictment with violating the Hobbs Act, 18 U.S.C. § 1951. They appealed after being convicted before a jury of both counts. Caldes was a field representative of AFL–CIO and Lowery was president of the Laundry and Drycleaning International Union, Local 369. The Laundry Workers Union and Mission Linen Supply Company (Mission) were involved in protracted negotiations for a collective bargaining agreement and these efforts were still in progress at the times of the incidents which were the basis of this indictment.

Mission is a corporation which engages in interstate commerce and is in the business of renting linen and other supplies to hospitals, hotels and other institutions. Jurisdiction is found in 28 U.S.C. §§ 1291 and 1294.

* Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

The Hobbs Act provides in pertinent part that:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in [interstate] commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

(1) * * *

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951.

Appellants were accused of two incidents. On October 24, 1969, they followed one Ramon Herrera, a driver for Mission, whose job was to deliver linen to Mission's customers. When Herrera stopped for a red light he saw Lowery throw an object into his truck from a car driven by Caldes. Herrera returned the truck to the company's plant and found a green substance which appeared to be a dye, along with broken glass on the floor of the truck. A malicious mischief report was filed with local police but no charges were instituted in state court. The FBI began surveillance of the appellants and on December 3, 1969, witnessed the events that formed the accusation of count 2. That afternoon FBI agents saw Caldes and Lowery drive to the Georgian Court Nursing Home, a customer of Mission. One agent testified that Caldes ran from the car toward the nursing home and then quickly returned to the car and drove away. The agent found a laundry hamper sitting in a breezeway directly in line with Caldes' path of travel full of line discolored by a green dye. A glass jar containing an identical substance

was later found in Caldes' car along with a list of Mission's customers and the numbers of its trucks.

The damage done in each instance was minimal and appellants seem not to seriously dispute their involvement in the mischief. They raised two points on appeal:

(1) did the Government establish beyond a reasonable doubt that defendants acted in furtherance of a plan to pressure the company into a collective bargaining agreement through the wrongful use of force, and

(2) does the Hobbs Act reach violence to property as a part of a plan to extort a thing of value in the form of a collective bargaining agreement covering wages, hours and working conditions of *wanted* employees?

■ The first can be disposed of quickly. There was a labor dispute which had gone on for almost two years involving Mission; defendants were labor leaders who were seen on two instances committing acts of vandalism against Mission's property of the type that could logically be inferred as "getting a message" to the company that if it did not settle, the level of violence might escalate. We are obliged to look at the evidence in the light most favorable to the Government in this criminal appeal, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and United States v. Nelson, 419 F.2d 1237 (9th Cir., 1969), and in a real sense there was ample evidence from which the jury could logically conclude that the violence was intended to pressure the company into an agreement.

■ The second claim presents more difficulty, and we conclude we must reverse upon the ground that the Act was not intended to reach low level violence committed in connection with bona fide labor disputes between employers and employees. In this, we try to carefully distinguish this case from one in which acts of extortion are committed to compel an employer to take on unwanted workers (featherbedding) or

to pay for work which the worker has no intention of performing. Our research has not led to the discovery of another federal appellate court that has addressed itself to this issue, but a recent district court case seems not inconsistent with our conclusions.[1]

The Hobbs Act was enacted in 1946 to correct what certain members of Congress felt to be an error created by the holding in United States v. Local 807, etc., 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). Congressman Hobbs first introduced his bill two weeks after the filing of the opinion in *Local 807*. That case construed portions of the Anti-racketeering Act of 1934, known as the Copeland Act, 48 Stat. 979 carried forward in 18 U.S.C. § 420a. Local 807 of Teamsters were truck drivers and helpers in New York City. They resented out-of-state drivers coming into New York to make deliveries of goods brought in from other shipping points and they stationed themselves at the entry points connecting New York City to bordering states and stopped trucks seeking to deliver merchandise to New York consignees and by threat and actual use of force and violence ordered the drivers to let a Local 807 man deliver the load from them into the city or pay the union equivalent of a day's wages. If the foreign driver paid the local member, his truck would be taken into the city, unloaded, reloaded and returned to him for the return trip. Often, after he paid the tribute, the foreign driver was compelled to drive his truck into New York as the local member would refuse to perform the service even when requested to so do.

Section 2(a) of the Anti-racketeering Act denounced the person who "in connection with . . . any act . . . affecting trade or commerce . . .—

(a) Obtains or attempts to obtain, by the use or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable consid-erations, or the purchase or rental of property or protective services, *not including, however, the payment of wages by a bona-fide employer to a bona-fide employee.*" (emphasis added).

*Local 807* held that persons who offered to perform services for another and who demanded and received union wages for such offer were exempted by Section 2(a) of the Act from criminal liability even though their proffered services were rejected. The Court held that the determining criterion was not whether the victim paid the money with the intent to buy protection but whether the money was demanded without the intention of performing any service. Then the Court concluded that even when it is known that an employer does not need additional workers, violence and threats accompanying a sincere offer to work is not extortion.

Congressional reaction to the *Local 807* decision was immediate and highly vocal. Many members saw the case as giving license to unions to use violence to exact wages as long as the laborer was willing to work. The legislative history of the Hobbs Act shows that the deliberate purpose of Congress was to eliminate Section 2(a) of the Anti-racketeering Act on which *Local 807* turned, so as "to prevent the rendition of that sort of decision by any court in the future . . . ." remarks of Congressman Sumners, 91 Cong.Rec. 11909 (H.R. Dec. 12, 1945).

By eliminating Section 2(a) however, Congress did not intend to eliminate traditional labor or union activity, albeit militant, which has as its object legitimate ends. The exclusion was not meant to provide impunity to the terroristic and extortionate activities of union members, but to protect union activity directed toward legitimate labor goals even when militantly pursued. It seems that the *Local 807* decision went beyond the holding it was called upon to reach and beyond the intent of Congress, in

1. United States v. Enmons et al., 335 F.Supp. 641 (E.D.La. 1971), Petition for cert. filed, 40 U.S.L.W. 3470.

condoning a union's engaging in violence as a means of getting wages so long as the union member was willing to work. This could be construed as permitting the use of robbery and extortion to bring about the hiring of unwanted, unneeded employees.

Conduct of this type was judicially frowned upon in United States v. Kemble, 198 F.2d 889 (3rd Cir.), cert. den. 344 U.S. 893, 73 S.Ct. 211, 97 L.Ed. 690 (1952). The defendant, a member of a New Jersey Truck Drivers Union, was convicted of employing actual and threatened violence against a driver not a member of defendant's local who had brought a load of merchandise by truck to New Jersey from another state. The defendant had sought to make the out-of-state driver hire a local member to unload his truck and pay a day's wages to him at union scale. The Court emphasized that the defendant was using extortion to bring about the hiring of an unwanted employee and held this to be a violation of 18 U.S.C. § 1951. Judge Hastie stated that he felt the Hobbs Act was broad enough to include the forced payment of wages where the money was for "imposed, unwanted and superfluous services such as the evidence shows *Kemble* attempted to enforce here by violent obstruction of commerce . . . ." The *Kemble* Court expressly declined to consider whether the Act reached the "normal demand for wages as compensation for services desired by or valuable to the employer." (198 F.2d page 892).

In United States v. Green, 350 U.S. 415, 419, 76 S.Ct. 522, 100 L.Ed. 494 the Court held that the use of threats of violence or violence, either by union members or others, as a means of exacting wages violates the Hobbs Act. *Green* differs from the case at bar in that it dealt with extortion from an employer in the form of wages to be paid employees for imposed, unwanted and superfluous or fictitious services. Following *Green* a series of lower court cases held that extortion occurred when a union member tried to foist himself or another union member on an employer by threats of force and violence. See, *e. g.*, Callanan v. United States, 223 F.2d 171 (8th Cir., 1955), cert. den. 350 U.S. 862, 76 S. Ct. 102, 100 L.Ed. 764 reh. den. 350 U.S. 926, 76 S.Ct. 210, 100 L.Ed. 810 (1955); United States v. Sweeney, 262 F.2d 272 (3rd Cir. 1959).

Our case involves the issue whether violence employed during the course of a valid, bona fide collective bargaining negotiation can be viewed as extortion within the meaning of the Hobbs Act. We have had urged upon us the argument that often in legitimate labor disputes, tempers grow short, blows are struck on the picket line, and minor but intentional damage is done to the property of the employer. We are also mindful that the damage done Mission's linen in these two instances was trivial when judged in monetary terms.

We turn to the question—did Congress intend to impose a felony conviction with severe penalties upon the union member caught in such byplay while trying to gain larger wages or better working hours and conditions for wanted employees? Certainly this conduct would constitute an offense against the state and would properly be described as an unfair labor practice.

The use of the term "extortion" in the Hobbs Act is based on the definition given the term "extortion" in the New York Penal Code. There the word is defined as ". . . the obtaining of property from another . . . induced by wrongful use of force or fear . . . ." This statute was interpreted in People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960). The Court of Appeals construed the term "force" as used to define extortion, as including coercion, physical violence, destruction of property and economic loss other than that induced by a lawful strike. In *Dioguardi*, the defendant received payments from the victim company which were, in effect, to buy an end to peaceful organizational picketing. The Court stated:

> "The picketing here . . . may have been perfectly lawful in its in-

ception (assuming it was part of a bona fide organizational effort) and may have remained so—despite its potentially ruinous effect on the employer's businesses—so long as it was employed to accomplish the legitimate labor objectives of organization. Its entire character changed from legality to criminality, however, when it was used as a pressure device to exact the payment of money as a condition of its cessation."

Thus the New York Court held that the payment out of fear of economic loss became extortion when the aim and objective of the strike was not merely to secure more favorable terms for the laborer but to exact money as a condition of further economic survival. This principle was followed in United States v. Kramer, 355 F.2d 891 (7th Cir. 1966) where a union leader threatened the employer with labor trouble if he was not paid a sum of money, and in United States v. Hyde, 448 F.2d 815 (5th Cir. 1971) where the state attorney general and his aide were convicted of a Hobbs Act violation for threatening life insurance and loan companies with state action which could lead to the closing of their businesses unless payments were made to the defendant. The Court there held that the "wrongful use of an official right may be a basis for extortion" page 833.

We pass to the question at hand, whether violence which is the by-product of the frustration and emotionalism engendered by a prolonged collective bargaining negotiation can be considered extortion as that term is used in the Hobbs Act. A fundamental rule of statutory construction is that criminal statutes must be strictly construed. United States v. Resnick, 299 U.S. 207, 209, 57 S.Ct. 126, 81 L.Ed. 127 (1936). Last term the Supreme Court said that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, 401 U.S. 808, 812, 91 S Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

Labor unions must be able to actively and vigorously pursue the interest of their members at all times, provided their activity is directed toward legitimate ends. The expansive interpretation of "extortion" used in the Hobbs Act as urged by the Government would make criminal the activities of many militant labor organizations. Under the Government's view, a labor union and its members would be guilty of extortion under Section 1951 if they strike for higher wages in violation of their collective bargaining agreement, because an "illegal" or "wrongful" strike to obtain higher wages constitutes a "wrongful" use of force to obtain the property of another. Spontaneous and sporadic fighting on the picket lines could also be condemned as the use of wrongful force and as extortion if this view was allowed to prevail. This type of action, including the use of violence during a strike, was the subject of congressional attention the year following enactment of the Hobbs Act. The Taft-Hartley Act contained specific provisions which condemned this action as unfair labor practices. See, 29 U.S.C. § 158(b) (4) (A). It is significant that during congressional deliberations on the bill no congressman expressed an opinion that the Hobbs Act of the preceding year covered union violence while a strike was in progress.

If the Hobbs Act was construed to cover acts of violence during the negotiations for a legitimate labor goal we see a further danger that it would permit a union member to be found guilty of extortion for mischievous misconduct even though he did not possess the requisite felonious intent to deprive another of his property. It does not appear that Congress intended that acts of violence which are the by-product of frustration engendered by a prolonged, bona fide collective bargaining negotiation to be "extortion" within the meaning of the Act. Indeed, in Local 807 the Government admitted in its brief that "Those who used coercion to secure genuine employment are engaged in a legitimate labor objective; their activities, although perhaps constituting breaches of the

peace do not partake of the nature of extortion." United States v. Local 807, 315 U.S at 522–523, 62 S.Ct. 642.

Finally, it appears to us that acts of vandalism of the type committed by these appellants would be more properly and suitably prosecuted in the state courts and it is doubtful if Congress intended by Section 1951 to elevate this type of conduct to the level of the federal court. *See* United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

We reverse and order the indictment dismissed.