**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Anthony J. YOKLEY, Defendant-Appellee.**

No. 76–1135.

United States Court of Appeals, Sixth Circuit.

Argued June 24, 1976.

Decided Sept. 13, 1976.

Rehearing Denied Nov. 23, 1976.

Philip Van Dam, U. S. Atty., William J. Richards, Asst. U. S. Atty., Detroit, Mich., David W. Elbaor, Government Regulations and Labor Section, Crim. Div., Washington, D.C., for plaintiff-appellant.

Thomas Jackson, F. Randall Karfonta, William L. Woodard, Detroit, Mich., for defendant-appellee.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and CECIL, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This appeal presents a question of first impression in this Circuit relating to the scope of the Hobbs Anti-Racketeering Act, 18 U.S.C. § 1951.[1] Anthony Yokley, the appellee, was indicted by a federal grand jury in the Eastern District of Michigan for violations of the Hobbs Anti-Racketeering Act and one violation of 18 U.S.C. § 2314 for the transportation of stolen goods in interstate commerce. This indictment was based on an armed robbery of a K–Mart Department Store in suburban Detroit on December 25, 1973. The District Court dismissed counts I and II of the indictment, ruling that the legislative intent of the Hobbs Act was to curb illegal labor activities and not to create an incursion into the criminal jurisdiction of the states. We hold that the Hobbs Act is not limited to labor activities but is aimed at racketeering activities whether labor or non-labor. We affirm the District Court on the ground that counts I and II of the indictment do not charge a racketeering offense within the scope of the statute.

The two counts dismissed by the District Court are made an Appendix to this opinion. They charge that on December 25, 1973, two men forcibly entered the suburban Detroit home of a K–Mart Department Store manager. While holding the store manager's family hostage, the intruders, later identified as Anthony Yokley and Thaniel Wells, forced the store manager to make arrangements for one of the gunmen to enter the K–Mart Store No. 4074. One man held the manager's family hostage

---

1. 18 U.S.C. § 1951 reads in part as follows:

 *Interference with commerce by threats or violence*

 Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

while the other accompanied the manager to the store where he forced him to open the store safe. After emptying the safe of currency, checks and credit card receipts, totaling $78,222.03, the other man joined his partner, who had left the store manager's home after the robbery was completed. Appellee and Wells were subsequently arrested in California after several checks, payable to the Detroit K–Mart Store, were seized from the safety deposit box of appellee in California.

The items taken from the K–Mart Store were the property of the S. S. Kresge Company. This company operates the chain of retail stores commonly known as "K–Mart Stores" throughout the United States. Approximately 95 per cent of the gross receipts and expenditures of the store were attributable to sales and purchases of goods manufactured at out-of-state locations and transported in interstate commerce to that store. Moreover, the funds stolen from the store were intended to finance the daily operations of the business, including the purchase of goods shipped in interstate commerce.

In holding that the Hobbs Act was limited to labor activities, the District Court relied, in part, on dicta in two recent decisions of this court. *United States v. Franks,* 511 F.2d 25, 31 n. 7 (6th Cir. 1975), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *United States v. Beck,* 511 F.2d 997, 1000 (6th Cir. 1975), *cert. denied,* 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975). After having the benefit of briefs and oral argument of counsel, and considering the legislative history of the Act, we hold that its applicability is not limited to corrupt labor activities as held by the District Court.

■ The limited purpose of the Hobbs Anti-Racketeering Act was to *amend* the Anti-Racketeering Act of 1934[2] without affecting the scope of the 1934 Act. Section 2(a) of the Act of 1934 made it unlawful to obtain or attempt to obtain money or property by the use of force or threat of force in connection with any act affecting interstate commerce. Specifically excepted from this section was "the payment of wages by a bona-fide employer to a bona-fide employee." The original bill (S. 2248) which was enacted as the 1934 Act and which passed the Senate without debate, contained no specific mention of labor or wages, but embodied a general prohibition against violence or coercion in connection with racketeering and interstate commerce. Subsequently, when fear was expressed by the American Federation of Labor that S. 2248 might result in serious injury to the legitimate activities of labor, the bill was redrafted to embody the exception. 78 Cong. Rec. 5859 (1934) (remarks of Senator Robinson); H.Rep. No. 1833, 73d Cong., 2d Sess. 2 (1934). The revised bill passed both the House and Senate without debate, when assurances were given that approval of organized labor had been obtained. 78 Cong. Rec. 10867, 11402–03 (1934).

In *United States v. Local 807,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the Supreme Court held that persons who offered to perform services for another and who demanded and received union wages for such offer were exempted under § 2(a) of the Act from criminal liability even though their proffered services were rejected. The Court held that the determining factor was not whether the victim paid the money with the intent to buy protection, but whether the money was demanded without the intention of performing any services. 315 U.S. at 533–34, 62 S.Ct. 642.

Congressional reaction to the *Local 807* decision was swift. Congressman Hobbs first introduced his bill two weeks after the filing of the opinion in *Local 807. United States v. Caldes,* 457 F.2d 74, 76 (9th Cir. 1972). The legislative history of the Hobbs Act shows that the sole purpose of Congress was to eliminate § 2(a) of the Anti-Racketeering Act of 1934 on which the *Local 807* decision turned so as "to prevent the rendition of that sort of decision by any court in the future. . . ." 91 Cong.Rec. 11909 (1945) (remarks of Congressman Summers).

2. Act of June 18, 1934, ch. 569, §§ 1–6, 48 Stat. 979 (formerly codified in 18 U.S.C. § 420(a).

*See also United States v. Green,* 350 U.S. 415, 419 n. 5, 76 S.Ct. 522, 100 L.Ed. 494 (1956); 89 Cong.Rec. 3201 (1945) (remarks of Congressman Gwynne); 89 Cong.Rec. 3202 (1945) (remarks of Congressman Walter); 89 Cong.Rec. 3210 (1945) (remarks of Congressman Hancock); 91 Cong.Rec. 11847 (1945) (remarks of Congressman Lane).

■ Although the purpose of Congress in enacting the Hobbs Act was to curb the kind of labor racketeering that is reflected by the *Local 807* case, the legislative history indicates that Congress intended the Act to apply to all illegal activities within the scope of the Act, whether labor or non-labor. The opponents of the Hobbs Act construed the elimination of the labor exception as a measure to hamper legitimate activities of organized labor. *See, e. g.,* 91 Cong.Rec. 11848 (1945) (remarks of Congressman Lane); 91 Cong.Rec. 11901 (1945) (remarks of Congressman Celler); 89 Cong. Rec. 3201 (1945) (remarks of Congressman Celler); 89 Cong.Rec. 3207 (1945) (remarks of Congressman O'Hara). The proponents of the bill, however, were able to point out that its prohibitions were applicable to all groups. *See, e. g.,* 89 Cong.Rec. 3201 (1945) (remarks of Congressman Hancock); 91 Cong.Rec. 11844 (1945) (remarks of Congressman Robsion and Michener); 91 Cong. Rec. 11900 (1945) (remarks of Congressman Hancock); 91 Cong.Rec. 11904 (1945) (remarks of Congressman Gwynne); 91 Cong. Rec. 11905 (1945) (remarks of Congressman Robsion); 91 Cong.Rec. 11909 (1945) (remarks of Congressman Vursell). *See also United States v. Caci,* 401 F.2d 664, 668 (2nd Cir. 1968), *cert. denied,* 394 U.S. 917, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *Carbo v. United States,* 314 F.2d 718, 732 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Accordingly, we reject the reasoning of the District Court that the Hobbs Act is limited solely to illegal labor activities falling within the scope of the Act.

The determinative question to be decided, however, is whether the facts charged in counts I and II of the indictment in the instant case are within the scope of the Act. The language employed in drafting § 1951 is extremely broad. Any robbery or extortion, or an attempt or conspiracy, having a de minimis affect on interstate commerce, might be held to be punishable under the Act. *See, e. g., United States v. Mazzei,* 521 F.2d 639, 642 (3rd Cir. 1975), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Amato,* 495 F.2d 545, 548 (5th Cir. 1974), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974); *United States v. DeMet,* 486 F.2d 816, 822 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 96 S.Ct. 1991, 40 L.Ed.2d 548 (1974). In *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), however, the Supreme Court, after examining the legislative history of the Act, held that the alleged illegal activity which was within the literal language of the statute was not within the Congressional intent.

Since the Congressional intent in enacting the Hobbs Anti-Racketeering Act, as an amendment to the Anti-Racketeering Act of 1934, was "nothing more than . . . undoing the restrictive impact of [the *Local 807*] case", *Enmons, supra,* 410 U.S. at 408, 93 S.Ct. at 1014, it is necessary to examine the legislative history of the Act of 1934 to determine the scope of its successor, the Hobbs Act. Pursuant to a Senate Resolution of May 8, 1933, a subcommittee of the Senate Committee on Interstate Commerce, the Copeland Committee, undertook an investigation of "rackets" and "racketeering" in the United States. S.Res. 74, 73d Cong., 1st Sess. (1933). After several hearings, the Committee initiated 13 bills, of which S.2248 was one. S.2248 was reported favorably by the Senate Judiciary Committee as a means for "prosecution of racketeers", but the report indicated that practices "not accompanied by manifestations of racketeering" were outside the scope of the Act. S.Rep. No. 1833, 73d Cong., 2d Sess. (1934). After S.2248 passed both the House and Senate without debate, Senator Copeland submitted a report in which he referred to the bill as a means "to close gaps in existing Federal laws and to render more difficult

the activities of predatory criminal gangs of the Kelly and Dillinger types". S.Rep. No. 1440, 73d Cong., 2d Sess. (1934).

 Moreover, the concern of Congress in amending the Act of 1934 by the enactment of the Hobbs Act was the elimination of "racketeering" in the United States. See, e. g., 89 Cong.Rec. 3205 (1945) (remarks of Congressman Celler); 89 Cong.Rec. 3207 (1945) (remarks of Congressman O'Hara); 91 Cong.Rec. 11844, 11905 (1945) (remarks of Congressman Robsion); 91 Cong.Rec. 11906 (1945) (remarks of Congressman Celler). Accordingly, although an activity may be within the literal language of the Hobbs Act, it must constitute "racketeering" to be within the perimeters of the Act. After considering the facts charged in the two stricken counts of the indictment in the instant case, we are not persuaded that the robbery of the K–Mart Store amounted to "racketeering" under the Act. Rather, the activity was within the exclusive criminal jurisdiction of the state of Michigan. See, M.C.L.A. §§ 750.213, 750.529.

Our decision in this case is reinforced by two additional principles: strict construction of criminal statutes and the necessity for explicit statutory language where there is a federal incursion into the criminal jurisdiction of the states. Justice Potter Stewart, speaking for the majority of the Supreme Court in Enmons, supra, stated:

Even if the language and history of the Act were less clear than we have found them to be, the Act could not properly be expanded as the Government suggests— for two related reasons. First, this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity. United States v. Wiltberger, 5 Wheat. 76, 95, [5 L.Ed. 37]; United States v. Halseth, 342 U.S. 277, 280, [72 S.Ct. 275, 276, 96 L.Ed. 308]; Bell v. United States, 349 U.S. 81, 83, [75 S.Ct. 620, 622, 99 L.Ed. 905]; Arroyo v. United States, 359 U.S. 419, 424, [79 S.Ct. 864, 867, 9 L.Ed.2d 915]; Rewis v. United States, 401 U.S. 808, 812, [91 S.Ct. 1056, 1059, 28 L.Ed.2d 493]. Secondly, it would require statutory language much more

explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247–248, [79 S.Ct. 773, 780–782, 3 L.Ed.2d 775]; United Constr. Workers v. Laburnum Constr. Corp., 347 U.S. 656, 665, [74 S.Ct. 833, 838, 98 L.Ed. 1025]; Garner v. Teamsters Local 776, 346 U.S. 485, 488, [78 S.Ct. 161, 164, 98 L.Ed. 228]; UAW Local 232 v. Wisconsin Employment Relations Bd., 336 U.S. 245, 253, [69 S.Ct. 516, 521, 93 L.Ed. 651].

As we said last Term:

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. . . . [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction." United States v. Bass, 404 U.S. 336, 349, [92 S.Ct. 515, 523, 30 L.Ed.2d 488]. (footnotes omitted).

410 U.S. at 411–12, 93 S.Ct. at 1015 (emphasis added).

The Government argues in this case that the Hobbs Act "encompasses the robbery of a business engaged in interstate commerce." This interpretation and application of § 1951, as urged by the Government, would encompass literally any armed robbery occurring in any state. Accordingly, under the de minimus interstate commerce rule, the robbery of a corner grocery store, pharmacy or gasoline service station, without more, would be a federal offense. The offense of armed robbery, traditionally a matter of concern under state criminal

laws, would become a matter within the responsibilities of United States Attorneys and the federal courts. The legislative history of the Hobbs Act and its predecessor statute demonstrates to our satisfaction that no such sweeping result was intended by Congress. If the time ever comes when Congress desires to expand federal criminal jurisdiction to include all armed robberies having any effect on interstate commerce, no matter how small, more specific language than the broad general provisions of the Hobbs Act will be necessary.

The decision of the District Court dismissing counts I and II of the indictment is affirmed.

### APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

CRIMINAL No. 4–81900

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY,
and THANIEL WAYNE WELLS,

Defendants.

---

INDICTMENT

---

## THE GRAND JURY CHARGES:

### COUNT ONE

1. That at all times pertinent to this Indictment, the S. S. Kresge Company, world headquarters at 3100 West Big Beaver Road, Troy, Michigan, was a profit corporation engaged in the business of general retail sales of a large variety of consumer goods at various retail outlets throughout the United States, with a large volume of said corporation's sales arising out of its "K–Mart" discount stores; that in connection with said retail sales business, the S. S. Kresge Company purchased and sold a large volume of retail articles and commodities from shipments in interstate commerce, used its funds to pay for the purchase of such retail articles and commodities which had travelled in interstate commerce, and arranged financing to purchase such retail articles and commodities which had travelled in interstate commerce;

2. That at all times pertinent to this Indictment, K–Mart Store No. 4074, located at 27500 West Eight Mile Road, Southfield, Michigan, was one retail outlet of said S. S. Kresge Company and was engaged in the business of general retail sales of a large variety of consumer goods; that in connection with said retail sales business, the said K–Mart Store No. 4074 purchased and sold a large volume of retail articles and commodities from shipments in interstate commerce, used its funds to pay for the purchase of such retail articles and commodities which had travelled in interstate commerce, and arranged financing to purchase such retail articles and commodities which had travelled in interstate commerce;

3. That at all times pertinent to this Indictment, Frank D. Meany was the manager of said K–Mart Store No. 4074, and David Charles Belcher was employed as a night porter at said K–Mart Store No. 4074 and was on duty on the night of December 24–25, 1973;

4. That from on or about some date prior to December 20, 1973, the exact date being to the Grand Jury unknown, and continuing thereafter to on or about December 25, 1973, in the Eastern District of Michigan, Southern Division and elsewhere, ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, and THANIEL WAYNE WELLS, Defendants herein, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed together, and with each other, and with divers other persons to the Grand Jury unknown, to obstruct, delay and affect commerce, as that term is defined in Section 1951 of Title 18, United States Code, and the movement of articles and commodities in such commerce, by robbery, as that term is defined in Section 1951 of Title 18, United States Code.

5. That it was part of said conspiracy that the Defendants, ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY,

and THANIEL WAYNE WELLS, would unlawfully take and obtain the property of the S. S. Kresge Company, K–Mart Store No. 4074, to-wit: a quantity of United States currency, checks and other negotiable instruments, against the will of said Company, by means of actual and threatened force and violence, and by creating fear of injury, immediate and future, to the person of employees of said Company and Store at the time of the taking and obtaining, including Frank D. Meany and his family.

All in violation of Section 1951, Title 18, United States Code.

## OVERT ACTS

That in effectuating the objects and purposes of said conspiracy, the Defendants ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, and THANIEL WAYNE WELLS, committed the following overt acts:

1. On or about December 20, 1973 the Defendants flew via American Airlines from Los Angeles, California to Metropolitan Airport in the Eastern District of Michigan, Southern Division.

2. From on or about December 20, 1973 to on or about December 25, 1973, Defendants, ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, and THANIEL WAYNE WELLS rented a room at the Dearborn Towne House, 2101 South Telegraph Road, Dearborn, Michigan.

3. On or about December 25, 1973, Defendants, ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, and THANIEL WAYNE WELLS, obtained entrance to the home of Frank D. Meany, and held captive said Frank D. Meany, Helen Meany, his wife, and children, Frank Meany Jr., and Neil Meany, at gun point.

4. On or about December 25, 1973, Defendant ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, went to K–Mart Store No. 4074 and obtained United States currency, checks and credit card receipts belonging to the S. S. Kresge Company and said store from David Charles Belcher by use of a hand gun.

## COUNT TWO

Paragraphs 1, 2, and 3 of Count One of this Indictment are hereby realleged and incorporated as if set forth in full.

That on or about December 25, 1973, at Southfield in the Eastern District of Michigan, Southern Division, ANTHONY JOSEPH YOKLEY a/k/a ANTHONY OAKLEY, and THANIEL WAYNE WELLS, Defendants herein, did unlawfully and wilfully obstruct, delay and affect commerce as that term is defined in Section 1951 of Title 18, United States Code to-wit: interstate commerce, and the movement of articles and commodities in such commerce by robbery, as that term is defined in Section 1951 of Title 18, United States Code, in that they did take and obtain and attempt to take and obtain the property of the S. S. Kresge Company, to-wit: approximately Seventy-Eight Thousand, Two Hundred Twenty-Two and 03/100ths ($78,222.03) Dollars in United States currency, checks and charge account receipts then in the lawful custody of David Charles Belcher, night porter, at the K–Mart store, 25700 West Eight Mile Road, Southfield, Michigan, by unlawfully taking and obtaining said currency, checks and charge account receipts from the said K–Mart store in the presence and custody of David Charles Belcher, against his will by means of actual and threatened force and violence to his person by the use of a hand gun and physical force; in violation of Title 18, Sections 1951 and 2(a), United States Code.