**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James A. RUSSO; Vincent Meli; Roby G. Smith, Defendants-Appellants.**

**Nos. 80–5052, 80–5054 and 80–5055.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 31, 1982.

Decided May 20, 1983.

Rehearing and Rehearing En Banc
Denied July 25, 1983.

Boyce F. Martin, Jr., Circuit Judge, filed concurring opinion.

Holschuh, District Judge, sitting by designation, concurred only in the result and filed an opinion.

Edward Sanders (argued), Detroit, Mich., for defendant-appellant in No. 80–5052.

---

\* The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

1. The Hobbs Act provides in pertinent part:
    (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned *not more than twenty years,* or both.
    (b) As used in this section—
        \* \* \* \* \* \*
    (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

2. Count One of the indictment stated, in pertinent part:

Leonard R. Gilman, U.S. Atty., Detroit, Mich., Sheldon N. Light (argued), John L. Newcomer, Detroit, Mich., for United States.

William J. Weinstein (argued), Weinstein, Kroll & Gordon, Marc I. Shulman, Southfield, Mich., for defendant-appellant in No. 80–5054.

Richard M. Lustig (argued), Lustig & Friedman, Southfield, Mich., for defendant-appellant in No. 80–5055.

Before MARTIN, Circuit Judge, BROWN, Senior Circuit Judge, and HOLSCHUH,\* District Judge.

BAILEY BROWN, Senior Circuit Judge.

Appellants, James A. Russo, Vincent Meli, and Roby Smith, were charged in a two-count indictment with conspiracy to violate and a substantive violation of the Hobbs Act, 18 U.S.C. § 1951.[1] The indictment charged that the appellants, who were an officer and an employee of J & J Cartage Company and a union local business agent, conspired to and did in fact obstruct, delay and affect interstate commerce by threatening employees of the Company with economic loss and thereby forced them to pay J & J Cartage Company's contributions to a union pension and welfare fund.[2]

\* \* \* \* \* \*

2. At all times pertinent hereto, the Company was contractually bound by the terms of the National Master Freight Agreement, Central States Area Local Cartage Supplemental Agreement and certain supplemental agreements thereto with the International Brotherhood of Teamsters, ... and was required to pay certain employer contributions to the Central States Southeast and Southwest Health, Welfare and Pension Funds, including the Michigan Conference Health and Welfare Fund....

\* \* \* \* \* \*

6. That commencing on or about the 18th day of November, 1972, and continuously thereafter up to on or about the 10th day of April, 1974, ... VINCENT A. MELI, JOSEPH D. CUSMANO, JAMES A. RUSSO, and ROBY G. SMITH, ... did knowingly and *willfully conspire, combine, confederate and agree together, and with each other ... to obstruct, delay and affect interstate commerce ... and did attempt to do so by extortion, to wit: by threats of economic loss, that*

Appellants were convicted on both counts and have appealed, claiming numerous errors. We overrule appellants' claims and affirm their convictions.

## BACKGROUND

The J & J Cartage Company was a corporation engaged in the business of hauling raw steel from the Detroit waterfront to plants and warehouses in the metropolitan Detroit area. Appellant James Russo, along with Joseph Cusmano,[3] was part owner of the Company, holding fifty percent of the stock. Appellant Vincent Meli was an employee of the Company, employed both as a public relations person and as a negotiator for the Company. Roby Smith was a business agent of Local 299 of the International Brotherhood of Teamsters, which, at the times pertinent to these proceedings, represented the Company's employees.

J & J Cartage Company employed approximately forty truck drivers to haul steel. The equipment used to haul the steel belonged in part to the Company and in part to the individual drivers. Some drivers owned both the tractor and trailer, some owned only the tractor, and some did not own either. Drivers who provided the equipment used to haul the steel were known as "owner-operators."

During the time of the conspiracy alleged in the indictment, the Company was party to collective bargaining agreements with Local 299 of the International Brotherhood of Teamsters, the bargaining representative of Company employees. The basic collective bargaining agreement for the trucking industry was the National Master Freight Agreement, which was supplemented regionally by both the Central States Area Local Cartage Supplemental Agreement and by a special rider known as the Local Cartage Steel Rider. Instead of minimum hourly rates of pay, as set forth in the National Master Freight Agreement, the Local Cartage Steel Rider established a system for paying drivers a percentage of the gross amount paid to the Company for the loads of steel actually hauled.

Specifically, Article 2 of the Local Cartage Steel Rider provided that owner-operators were to be paid not less than 75% of the gross earnings, while drivers other than owner-operators were to receive no less than 60% of the gross. Articles 54 and 55 of the Central States Area Local Cartage Supplemental Agreement provided that the employer was to contribute to the Central States Southeast and Southwest Areas Health and Welfare Fund, as well as to the Pension Fund. Article 7 of the Rider provided that: "It shall be unlawful and illegal for Health and Welfare and/or Pension payments to be deducted from Owner-Operator's gross earnings."

It is undisputed that sometime in 1972 some of the Company's drivers organized a grievance committee which prepared a list of the drivers' grievances. The drivers sought, among other things, to have the Company pay social security taxes and make contributions to the Teamster health and welfare and pension plans with respect to them, as expressly required under the collective bargaining agreement. The grievances were presented to both the Company and to appellant Roby Smith, the Teamster business agent assigned to represent the Company's drivers.

In an attempt to resolve some of the employees' grievances, the Company man-

is to say, the defendants did force the drivers who were employees, agents, and owner-operators of the Company to pay the Company employer contributions to the Funds with their consent induced by the wrongful use of force and fear, in that the defendants did threaten certain drivers of the Company with unprofitable truck loads, the loss of their jobs, and the loss of equity in their equipment unless they agreed to the deduction from their weekly gross earnings.

Count Two of the indictment alleged the same conduct as the conspiracy offense, but as a substantive offense.

3. Joseph Cusmano, the founder and half owner of J&J, along with appellant James Russo, was also named as a defendant. Cusmano was tried separately and convicted on both counts of the indictment. This court, in a 2–1 decision, reversed his conviction on appeal. *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981), discussed more fully *infra.*

agement called a general meeting of the drivers on November 26, 1972. Appellants Russo and Meli, along with two other Company representatives, appeared on behalf of the Company. According to several of the drivers, the Company proposed that 15% of the gross earnings of each driver be deducted to cover the costs of the drivers' demands. This proposal was voted down. The November 26, 1972 meeting was adjourned with no agreement having been reached between management and the employees.

The Company called a second general meeting between management and the employees on March 25, 1973. At this time the Company presented a new proposal to the drivers: in return for an 11% "service charge" taken from the drivers' gross earnings, the Company would meet its obligations under the collective bargaining contract. The Company explained that, after deducting the 11% service charge, the amount available for division between the Company and a driver would equal 89% of the gross. The drivers overwhelmingly voted against the 11% proposal by a show of hands.

After the meeting of March 25, the Company's president, Joseph Cusmano, called each of the drivers individually into his office, and through promises, threats of economic loss, and misrepresentation, procured their signatures on a Supplementary Agreement providing for the 11% deduction discussed above. The agreement was later signed by appellant Roby Smith in his capacity as the representative of Local 299. This 11% "service charge" became effective on June 3, 1973, and continued in effect until on or about April 10, 1974.

There was testimony at trial that appellant Meli had a reputation as being a part of the Mafia, this being admitted in evidence to show the state of mind of the drivers when they agreed to the deduction of the "service charge." There was also evidence that appellant Smith failed to process grievances and acted in cooperation with the Company in approving this supplemental agreement that was contrary to and invalid under the collective bargaining agreement.

The first trial of appellants Meli, Russo, and Smith was declared, after several weeks, a mistrial due to the death of the trial judge, the Honorable Lawrence Gubow. The case was reassigned to the Honorable Patricia J. Boyle.

As stated, all three appellants were tried and convicted by a jury on both counts. The court sentenced each appellant to three years imprisonment for each count, to be served concurrently. Appellants Meli and Russo were fined $10,000.00 for each count of the indictment, while Smith was ordered to pay a fine of $5,000.00 for each count.

## I

Appellants contend that there was, at trial, a constructive amendment of the indictment. They contend, and the Government agrees, that the indictment charges only an extortion by threats of economic loss and does not charge an extortion by threats of physical violence.[4] Appellants further contend that this constructive amendment was effected because of the admission of evidence that appellant Meli had a reputation as being connected with the Mafia, which could only connote physical violence, and because the charge allowed a finding of extortion by means of threats of physical violence.

As stated (n. 3 at p. 211), Cusmano's trial was severed, and he was tried separately prior to the trial of these appellants. There, the charge to the jury clearly allowed a finding of extortion by threat of physical violence as well as by threat of economic loss. Cusmano's conviction was reversed on the ground that the indictment was constructively amended at trial. As we read this court's opinion in Cusmano's case, the court did not hold that the admission of

---

4. This was the holding of the majority in *United States v. Cusmano,* 659 F.2d 714, 715 (6th Cir.1981).

proof as to Meli's reputation of Mafia connections constructively amended the indictment; rather, it held the indictment was so amended because the charge to the jury at Cusmano's trial specifically allowed a finding by the jury of extortion by threats of physical violence as well as by threats of economic loss. After quoting from the charge to such effect, the opinion in *Cusmano* then states:

> We cannot know whether the grand jury would have included in its indictment an allegation of extortion through threats of physical violence. The admission of evidence of such extortion, together with the trial court's instructions, indicate that this might have been the basis of Cusmano's conviction. If so, he was convicted on charges the grand jury never made against him. This was fatal error. [citations omitted.]

659 F.2d at 719.

On the contrary, the charge in the instant case made clear that the alleged extortion to be considered by the jury was extortion by threats of economic loss. In this connection the court charged:

> Fear is a state of anxious concern, alarm or apprehension of anticipated harm. It does not necessarily refer to physical fear or fear of violence. It includes fear of economic loss. It exists if you find beyond a reasonable doubt that by threats of the defendant, fear of economic loss was created in the victim's mind, or that the defendants knowingly and willfully used the victim's fears of economic loss; and that under the circumstances it was reasonable for the victim to have such fear; and that the defendant made use of such fear to extort or attempt to extort money.

> The essence of the crime of extortion is a defendant's knowing and willful use of that fear, not its creation. The defendant need not have created the fear in the minds of the victims. It matters not that the fear may have already been present in the minds of the victims as a result of the victim's previous experience, or that the fear may have been created by people other than a defendant, or that the defendant may have created such fear.

> The law requires proof, beyond a reasonable doubt, that the fear was reasonable and actual, and that the defendant knew of and intentionally used that actual fear, because the law does not hold any man responsible for the unforeseeable or the unreasonable reactions of those with whom he speaks or deals.

> But the law does prohibit the knowing and willful creation or instilling of fear, or the knowing and willful use of existing fear, when this is done with the specific purpose of inducing another to part with his property.

> In making your decision as to whether the fear of the employee drivers of J & J Cartage Company was reasonable, should you find such fear, you should use the standards you would use in making decisions in your everyday life.

> You may consider the testimony of the state of mind of the alleged victim in determining whether such economic fear existed and whether such fear was reasonable. The testimony of an alleged victim as to what people other than a defendant had told him is admissible not for the truth of what was said but is admissible as to whether the hearing of such statements would have tended to produce a reasonable fear in the victim's mind. Such statements by people other than a defendant to a victim may, therefore, only be considered in determining the victim's state of mind, that is, whether there was fear on the part of the victim and whether the fear was reasonable.

App. 1085a *et seq.*

\* \* \* \* \* \*

The mere deduction of the 11 percent, or the taking of $15.50, or the payment of health, welfare, and/or pension contributions, unaccompanied by fear of economic loss would not constitute extortion.

App. 1088a *et seq.*

\* \* \* \* \* \*

The defendants are charged only with conspiracy to obstruct, delay and affect interstate commerce, and obstructing, delaying and affecting interstate commerce, by forcing employees of J & J Cartage Company to pay health and welfare and pension contributions, which [*sic*] the consent of said employees induced by the wrongful use of fear and threat of economic loss from November 1972 up until and including April 10, 1974.

App. 1092a.

■ We therefore conclude that, different from *Cusmano,* there was no constructive amendment to the indictment.

## II

■ Appellants also contend that it was error to admit evidence of Meli's reputation as being connected with the Mafia. This evidence was admitted solely for the purpose of showing the state of mind of some of the victims of the alleged extortion at the time that they consented to the 11% deduction, the proffered purpose of which was to enable the Company to make payments to the Teamster welfare and pension fund. The district judge had determined, as a result of a motion *in limine,* not to exclude such reputation evidence on the ground that reputation for being involved in the Mafia could only create a fear of physical violence. She concluded, we think correctly, that such reputation could also reasonably create a fear of an actual ability to inflict economic loss. As clearly set out in that part of the charge heretofore quoted, and in the next-quoted parts of the charge, proof of the Mafia reputation could be considered by the jury only to the extent that it created a fear of economic loss, and that such fear could be the basis of a finding of extortion only if it was actual and reasonable and a defendant knew of and intentionally made use of such actual fear.

There have been instances during the course of this trial where references were made to Vincent Meli's alleged affiliations with organized crime. These references were admitted into evidence for a very limited purpose, that is, to allow you to evaluate the state of mind of the witnesses. You are not here to determine, or even speculate on, who, if anyone, is an alleged affiliate of organized crime. You are only to determine if the defendant is guilty or not of the charges set forth in the indictment. Mr. Meli's reputation is not before you for an ultimate determination of fact.

App. 1093a–1094a.

\* \* \* \* \* \*

To the extent that Mr. Meli's reputation may reasonably bear on the witness's state of mind, you may take it into consideration. So, as you were cautioned before, you must discipline yourselves to consider this evidence only for this very limited purpose.

App. 1094a.

We conclude that it was not error to admit evidence of Meli's Mafia reputation. In *United States v. Billingsley,* 474 F.2d 63 (6th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 42, 38 L.Ed.2d 51 (1973), a prosecution under the Hobbs Act, it was held that the reputation of the defendant, a business agent for a union, was admissible to show the fear and the reasonableness of the *fear* of a contractor when the business agent threatened to shut down a job if the contractor did not hire some unneeded and unwanted iron workers. While, in the instant case, the district court could have excluded this reputation evidence, pursuant to Rule 403, FED.R.EVID., because of the danger of unfair prejudice, the district court did not abuse its discretion in admitting it.

## III

Appellants contend that the indictment does not charge a crime and that the evidence (even taking the Government's view of the evidence) does not prove a crime under the Hobbs Act. Therefore, appellants contend, the indictment should have been dismissed or a directed verdict of acquittal should have been granted. Relying primarily on *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379

(1973), appellants argue that their conduct could not constitute a crime under the Act because their purpose, in obtaining consent from the drivers to the reduction of the driver's share of the revenue, was not "wrongful." Appellants particularly rely on the allegation in the conspiracy count that it was a part of the conspiracy, *inter alia,* "to increase the employer share of the profits from the operation of the Company. . . ." Appellants argue that they had a right to protect their interest in realizing a profit, and sought to protect that interest by shifting to the employees the burden of paying into health, welfare and pension funds.

Preliminarily, we note that the record in *Cusmano* reflects that this very argument was there made by appellant with reliance on *Enmons;* and while the *Cusmano* court did not expressly rule on this contention, it did so by inference. If that court had accepted this argument that the conduct alleged in the indictment did not amount to a Hobbs Act violation, it would have reversed and remanded for dismissal of the indictment. Instead, the court, because it determined that the indictment had been constructively amended at trial, reversed but remanded for a new trial.

In any case, we conclude that the doctrine of *Enmons* does not support appellants' contention that the indictment should have been dismissed or a verdict directed. In that case, the defendants, members and officials of labor unions on strike for a new collective bargaining contract with higher wages, committed acts of violence against the employer. The acts of violence were the basis of the Hobbs Act indictment. The district court dismissed the indictment on the ground that such acts of violence were not covered by the Act. The Supreme Court agreed, holding only that the Act does not proscribe "the use of force to achieve legitimate collective-bargaining demands." *Id.* at 408, 93 S.Ct. at 1014. The Court held that the use of "force, violence or fear" is not "wrongful," as is required by the Act, unless "the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.* at 400, 93 S.Ct. at 1009.

In the instant case, the Company, for which appellants acted, had no legitimate claim to the "service charge" of 11% of the gross revenues. This is true because the existing contracts expressly required the Company to make the payments to the welfare and pension funds out of the Company's own funds. Indeed, the contract provided that it would be "unlawful and illegal" to deduct the welfare and pension payments from the owner-operator's gross earnings. Moreover, the provision requiring the Company to make payments to the pension and welfare funds was, as stated, contained in a collective bargaining contract, and yet the agreement to shift this burden to the drivers did not result from collective bargaining. It is true that co-defendant and appellant Smith, the business agent for the local, signed the agreement, but this was done after it had been individually signed by the drivers as a result of individual negotiation with and pressure exerted on them by representatives of the Company. As we see it, the situation for purposes of the applicability of the Hobbs Act would not have been different had the drivers, as a result of threats of economic loss, been forced to take money out of their pockets and pay it to the Company to be used to satisfy the Company's legal obligation to the pension and welfare funds.

While it is not necessary to our decision here, we further point out that the *Enmons* exception to the application of the Hobbs Act has been held to be confined to payments gained or sought in furtherance of legitimate *labor* objectives. *United States v. Quinn,* 514 F.2d 1250, 1257 (5th Cir.1975). Further, in *United States v. Cerilli,* 603 F.2d 415, 419 (3d Cir.1979), it is said:

> More importantly, *Enmons* is a labor case. The Court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context. Any application of *Enmons* to cases outside of that context must be done with caution.

603 F.2d at 419.

We therefore conclude that the indictment charges crimes under the Hobbs Act

and that, under the Government's view of the evidence, a case was made for submission to the jury.

## IV

■ Appellants further contend that there was not sufficient evidence to establish a conspiracy between the appellants and Cusmano, who actually obtained the signatures of the drivers on the agreement allowing the deduction of 11% from their share of the revenues. Meli contends that he was only a salesman for the Company and knew nothing of it. Russo claims that he was an "outside" man and, though he was a 50% owner and officer of the Company, had nothing to do with either the Company's labor relations or Cusmano's activity. Smith contends that he had no knowledge of the pressure placed on the drivers to execute the agreement and that he thought that it was a proper agreement when he signed it. We conclude, however, that there was substantial evidence, taking the view most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), to support the allegations in each count of the indictment.

Appellants make other claims of reversible error but, upon due consideration, we conclude that they are not well taken and must be overruled.

The judgment of the district court is therefore Affirmed.

BOYCE F. MARTIN, Jr., concurring.

Given both the obvious interdependence between Judge Brown's opinion in this case and *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981), an opinion which I authored, and the thorny issue at stake in each, I feel a special concurrence is in order. As the *Cusmano* opinion implies, the panel considered and resolved affirmatively the question of whether the Hobbs Act applies to employer activity of the character proven here. I continue to believe that *Cusmano* was decided correctly.

I should add that I agree with Judge Holschuh's analysis of *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). We part company, however, over its application to the facts of this case. In *Enmons,* in the context of a lawful strike by a union in pursuit of a collective bargaining agreement, the Court held that the utilization of wrongful means in pursuit of legitimate labor objectives, although punishable by other laws, did not violate the Hobbs Act. The distinguishing factor in this case, it seems to me, is the objective. Here the employer, outside the collective bargaining context, attempted to obtain by wrongful means and under the guise of "service charge" an objective which the parties' own contract specified would be "unlawful and illegal"—the shifting of responsibility for welfare and pension fund payments to the employees. It seems to me that under these circumstances *Enmons* is no bar to application of the Act.

HOLSCHUH, District Judge, concurring only in the result.

This case, in my view, is of great significance because of its potential impact on the activities of both labor and management in the resolution of industrial disputes. It squarely presents the important question of the extent to which the Hobbs Act, a criminal statute with severe penalties for its violation, applies to disputes between labor and management over the terms and conditions of employment, a subject that is already extensively regulated by other federal statutes.

In labor's struggle for higher wages and better working conditions and in management's efforts to minimize labor costs, the use of threats of economic loss is commonplace. Employees threaten to shut down an employer's plant by strike if their demands for higher wages are not met; employers in today's economy have threatened to shut down their own plants if employees do not agree to reduce their wages. Threats of economic loss take many forms, of course, and occur in many different settings. Some are properly made across a conference room table during collective bargaining negotiations; some are surreptitiously and improperly made and clearly constitute unfair

labor practices. The question of when a threat of economic loss made during the course of a labor dispute between an employer and the employer's own employees becomes not just an unfair labor practice but a violation of the Hobbs Act, the critical issue on this appeal, is neither well settled nor easily resolved.[1] This case, with its *Cusmano* companion, may be the first case in which the Hobbs Act has been held to apply to activities between an employer and the employer's own employees while engaged in an attempt to resolve a labor dispute over terms and conditions of employment.[2] The ramifications of the majority opinion are both far-reaching and, to me, troublesome for both labor and management.

Although, for the reasons hereafter set forth, I do not believe that it was Congress' intention that the Hobbs Act apply to the conduct of the defendants in this case, I must agree with the majority that the panel which previously heard the *Cusmano* appeal silently but implicitly concluded that the activities of the defendants in this case do constitute a Hobbs Act violation. It is because I regard that earlier decision as being binding on this panel, absent an *en banc* decision overruling the *Cusmano* decision, that I concur in the result reached by the majority in the present case. However,

I write separately to state my disagreement with the very broad interpretation given to the Hobbs Act by these decisions and my own belief that they are contrary to both the intention of Congress and the Supreme Court's interpretation of the Act as set forth in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1972).

## I.

### A.

Any consideration of the legislative background of the Hobbs Act must begin with the Federal Anti-Racketeering Act of 1934[3] which resulted from an investigation by the Senate Committee on Interstate Commerce of "rackets" and "racketeering" in the United States. The original Senate bill contained prohibitions against violence or coercion in connection with interstate commerce, and although a memorandum of the Justice Department referred to the bill as not including "the usual activities of capitalistic combinations, bona fide labor unions, and ordinary business practices which are not accompanied by manifestations of racketeering,"[4] representatives of organized labor nevertheless expressed fear that the proposed legislation could result in serious injury to labor. In order to obtain labor's approval, the bill was revised[5] to include an exception concerning "the pay-

---

1. Counsel for the Government, at the outset of his oral argument in this case, stated "I don't think [the scope of Enmons] has been adequately determined as of this point," referring to the need to have this Court determine the applicability of the Hobbs Act, as interpreted and applied by the Supreme Court in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1972), to cases of this nature involving an employer and the employer's own employees.

2. See, *infra,* Section IV, distinguishing *United States v. Quinn,* 514 F.2d 1250 (5th Cir.1975), and *United States v. Cerilli,* 603 F.2d 415 (3rd Cir.1979), cited in the majority opinion.

3. 48 Stat. 979.

4. *United States v. Local 807 of International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America,* 315 U.S. 521, 528 n. 5, 62 S.Ct. 642, 645 n. 5, 86 L.Ed. 1004 (1942).

5. As enacted, § 2 of the Act provided, in part,
   Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—
   (a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or
   (b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or
   (c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b); . . .

ment of wages by a bona fide employer to a bona fide employee." [6]

In *United States v. Local 807 of International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the Supreme Court was required to interpret this exception. That case involved a local union, its officers and other members who were indicted under the Hobbs Act for using threats and violence to coerce owners of trucks entering New York City to pay a day's union wages for services, regardless of whether those services were needed or wanted by the truck owners. The Court gave the exception a very broad construction, holding that it covered not only persons who were employees at the time of the alleged misconduct but also third persons who attempted by violent means to become employees. Of greater importance, however, was the Court's extremely broad construction of the terms "wages," "bona fide employee" and "bona fide employer" contained in the exception. The majority extended the immunity of the exception even to the defendants in the *Local 807* case who, after their offer to perform services was rejected, demanded payment for work that was not done and resorted to violence to obtain such payments. The dissenting Justice strongly argued that such payments could not be considered as "wages," such defendants could not be considered as "bona fide employees" and the compulsion of such payments could

not be considered "a legitimate object of a labor union." *Id.* at 541, 62 S.Ct. at 650.

Congress expressed its disapproval of the Supreme Court's *Local 807* decision by enacting the Hobbs Act. The House bill which became the Hobbs Act eliminated the wage exception that had been the basis for the *Local 807* decision, and it is clear that the specific purpose of the Act was to correct the result in the *Local 807* case.[7] In *United States v. Yokley,* 542 F.2d 300, 302 (6th Cir.1976), the Sixth Circuit Court of Appeals concluded that,

> the legislative history of the Hobbs Act shows that the sole purpose of Congress was to eliminate § 2(a) of the Anti-Racketeering Act of 1934 on which the *Local 807* decision turned so as "to prevent the rendition of that sort of decision by any court in the future. . . ."

Although Congress intended to include within the scope of the Hobbs Act the use of violence and extortion to extract payments for superfluous services rejected by an employer, Congress was also concerned that the new Act not be construed in such a manner as to affect national labor-management relations acts. The Hobbs Act, therefore, expressly provided that the Act "shall not be construed to repeal, modify or affect" the Clayton Act,[8] the Norris-LaGuardia Act,[9] the Railway Labor Act,[10] or the National Labor Relations Act.[11]

It seems clear that neither the Anti-Racketeering Act of 1934 nor its successor, the

---

**6.** In a letter to the House Committee on the Judiciary, the Attorney General to the Committee stated, in part,

> We believe that the bill in this form will accomplish the purposes of such legislation and at the same time meet the objections made to the original bill.
>
> The original bill was susceptible to the objection that it might include within the prohibition the legitimate and bona fide activities of employers and employees. As the purpose of the legislative is not to interfere with such legitimate activities but rather to set up severe penalties for racketeering by violence, extortion or coercion, which affects interstate commerce, it seems advisable to definitely exclude such legitimate activities.

**7.** As Congressman Hancock explained,

> [t]his bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce. That is all it does.
>
> 91 Cong.Rec. 11900.

**8.** The Hobbs Act specifically states it will not affect 15 U.S.C. § 17, the codification of the section of the Clayton Act providing that the antitrust laws are not applicable to labor organizations.

**9.** 29 U.S.C. §§ 101–115.

**10.** 45 U.S.C. §§ 151–188.

**11.** 29 U.S.C. §§ 151–166.

Hobbs Act of 1945, was designed to punish labor for activities employed in its pursuit of legitimate labor goals, even though those activities may include violence or the threat of economic loss. As even the dissenting Justice in the *Local 807* case acknowledged, "the procuring of jobs by violence is not within the [Anti-Racketeering] Act." 315 U.S. at 541, 62 S.Ct. at 650. The problem with the majority decision in the *Local 807* case was its holding that the procurement of money by violence for the performance of no work or superfluous work in the face of a refusal by the victim to enter into an employment agreement was also not within the Anti-Racketeering Act. The Hobbs Act made it clear that Congress did not regard obtaining money for no work or for superfluous and rejected services to be a legitimate objective of a labor union.

The important point is that neither the Anti-Racketeering Act nor the Hobbs Act was intended to make criminal the use of violence or threats of economic loss if such activities had a legitimate labor goal, *e.g.*, procurement of jobs involving bona fide and substantial services or obtaining increased wages or better working conditions. The means used to obtain such goals may well constitute an unfair labor practice under the extensive federal acts governing the conduct of labor, and the use of violence to obtain such goals may be punishable as a crime under local statutes. However, insofar as the Hobbs Act is concerned, its legislative background reveals no intention of Congress to impose the severe criminal sanctions of that Act upon activities of labor aimed at achieving a legitimate labor objective. If Congress did not intend to impose the severe criminal sanctions of the Hobbs Act on activity of labor having a legitimate labor objective, then it must follow that it did not intend to impose those sanctions on activity of management having a legitimate management objective.

**B.**

Following the passage of the Hobbs Act, the Supreme Court had occasion to construe the Act in order to determine its application in cases involving labor disputes. *United States v. Green,* 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1955), involved, as did the *Local 807* case, the use of threatened force and fear to force an employer to pay money, in the words of the *Green* indictment, "for imposed, unwanted, superfluous and fictitious services of laborers." *Id.* 350 U.S. at 417, 76 S.Ct. at 524. As in *Local 807,* the prospective employer had refused to employ the unneeded and unwanted workers. Considering the legislative history of the Hobbs Act, the Court's conclusion in *Green* that the allegations of the indictment came within the terms of that Act is not surprising. The extraction of money for superfluous services rejected by the prospective employer could not be considered a legitimate function of labor.

Approximately seventeen years later in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1972), which is unquestionably the leading Supreme Court case on the applicability of the Hobbs Act in labor-management cases, the Supreme Court again construed the scope of the Hobbs Act's coverage. Unlike *Local 807* and *Green,* the *Enmons* case did not involve an attempt to obtain tribute for superfluous and rejected services. It involved, as does the present case, a labor dispute between an employer and its own employees over the terms and conditions of employment. In *Enmons,* employees of Gulf States Utilities Company were on strike and were seeking a new collective bargaining agreement. The defendants, members and officials of the employees' labor union, were indicted under the Hobbs Act for using violence—including damaging the company's transformers and blowing up a substation owned by the company—in order to force the company to pay higher wages to the employees through a new agreement.

In reaching its decision that the facts in *Enmons* did not constitute a violation of the Hobbs Act, the Court relied not only upon the legislative history but also upon the specific language of the Act, which indicated to the Court Congress' intention to restrict the scope of the Hobbs Act in labor

disputes. The Supreme Court's analysis of the language of the Hobbs Act focused on the meaning of the term "wrongful" as used in the Act. The term "wrongful," in the words of the Supreme Court, "limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. at 1009. The Supreme Court held that the term "wrongful" did not refer to the *means* employed to obtain the property; those means proscribed by the statute are always wrongful. Instead, the Court concluded that the term "wrongful" must apply to the *objective* of the defendants, and the Court held that only where the alleged extortionist has no lawful claim to the property obtained would the obtaining of the property be "wrongful." Inasmuch as the objective of the employees—obtaining higher wages in return for genuine services—is a legitimate union objective, the Hobbs Act was held to have no application to the defendants, even though the means used to achieve that objective were clearly wrongful.

The Supreme Court found further support for its decision in (1) the absence of any prior cases in which the Hobbs Act had been applied to the fact pattern in *Enmons,* (2) the fact that the Hobbs Act is a criminal statute and must, therefore, be strictly construed, with any ambiguity being resolved in favor of lenity, and (3) the fact that nothing in the Act's history or its language could justify "the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States." 410 U.S. at 411, 93 S.Ct. at 1015.

Thus, as I read *Enmons,* use of wrongful *means*—and the use of violence on a picket line is clearly wrongful—is not enough to come within the coverage of the Act. To come within the prohibitions of the Act the *objective* must be wrongful, *i.e.,* the use of robbery or extortion or violence to obtain property to which the defendant "has no lawful claim." Because striking employees may lawfully claim higher wages, this is a

legitimate labor objective, and the Hobbs Act does not apply to the conduct of such employees regardless of how reprehensible it may be and regardless of the fact that such conduct may violate other state or federal laws.

If, then, the Act does not apply to a labor union's use of wrongful means to achieve legitimate labor objectives, then certainly the same construction applies to management, and the Act should not apply to management's use of wrongful means to achieve legitimate management objectives. If management in the *Enmons* case, for example, had retaliated by violently assaulting the strikers in an effort to break the strike and to force acceptance of management's wage offer, would management have been guilty of a violation of the Hobbs Act? Clearly such conduct would have violated other laws, but under the Supreme Court's interpretation of the Hobbs Act I do not believe such conduct would have come under the coverage of that Act. Although the means employed in my hypothetical case are just as deplorable as the means employed by the striking workers in *Enmons,* Congress did not intend the Hobbs Act to regulate the *means* employed by either labor or management when they are seeking the *legitimate objectives of labor or the legitimate objectives of management.*

If my reading of *Enmons* is correct, then it remains to apply that teaching to the facts of the present case.

## II.

The pertinent facts in the present case are set forth in the majority opinion. It is undisputed that the company was contractually obligated by the Central States Area Local Cartage Supplemental Agreement to contribute to the Central States Southeast and Southwest Areas Health and Welfare Fund as well as to the Pension Fund, and that the company was prohibited by the agreement from deducting those contributions from the driver's gross earnings. It is also undisputed that the company had not made the required contributions and was in

breach of the collective bargaining agreement. The drivers themselves sought to enforce compliance with the agreement by organizing a grievance committee which presented their grievances to the company, including the demand that the company make the required contributions to the health and welfare and pension plans. As the majority opinion notes, the company attempted to resolve those grievances by calling a meeting of the drivers and proposing a new wage agreement whereby the amount of the gross payments received by the cartage company for each load hauled by a driver would be reduced by 15%, prior to any division of the money between the company and the drivers, in order to cover the company's cost of meeting its contractual obligations. When the drivers refused to agree to this reduction in their compensation, a second attempt was made by the company to resolve the dispute. In a subsequent meeting the company proposed that the earnings of each driver would be reduced by the deduction of an 11% "service charge" from the gross amount available for distribution between the company and a driver in return for which the company would meet its obligations under the collective bargaining agreement. This proposed reduction in compensation was also rejected by the drivers.[12]

Having failed in the efforts to obtain a modification of the wage agreement by a vote of the drivers during the meetings of the drivers and management, the company's president, Joseph Cusmano, called each of the drivers individually into his office and through promises, threats of economic loss and misrepresentations, obtained their signatures on a Supplementary Agreement which changed the wage agreement previously agreed upon by reducing the drivers' compensation through deduction of the 11% from the gross amount available for distribution between the company and the drivers.

## III.

Viewing the undisputed evidence in the light most favorable to the Government, I am unable to conclude that the defendants' actions fall within the scope of the Hobbs Act and outside the category of activities found in the *Enmons* decision to be excluded from the Hobbs Act's coverage. This conclusion rests upon my opinion that an attempt by management to reduce its labor costs through a modification of a collective bargaining agreement is a legitimate management objective.

Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), explicitly sets forth the means by which a mid-term modification of a collective bargaining agreement may be obtained. Failure to comply with the procedures set forth in § 8(d) constitutes an unfair labor practice. *See Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 183–88, 92 S.Ct. 383, 399–402, 30 L.Ed.2d 341 (1971); *N.L.R.B. v. Northeast Oklahoma City Mfg. Co.*, 631 F.2d 669, 675 (10th Cir.1980). Section 8(d), therefore, is a recognition by Congress of the right of labor and management to seek modifications of a collective bargaining agreement during the life of that agreement and prescribes the procedures to be followed for obtaining such modifications. Thus, the fact that a collective bargaining agreement is in effect does not mean that labor and management cannot seek changes in that agreement or that demands for concessions are in any sense unlawful. Those demands do not, of course, have to be accepted, but the objective of labor in seeking greater benefits and the objective of management in seeking lower labor costs are legitimate objectives even though the parties are already contractually bound at that time by a previously executed collective bargaining agreement.

12. As the Government noted in footnote 7 at page 14 of its brief in this case,

> [t]he 11% "service charge" would reduce the amount available for division between a driver and [the company] under the provisions of the collective bargaining agreement to 89%

of the gross. Thus an owner-operator with a tractor would receive 60% of that 89%, actually only 53.4% of the gross—6.6% less than the amount to which he was entitled [under the original collective bargaining agreement].

I recognize that the evidence in the present case established without question that the defendants (1) breached the Central States Area Local Cartage Supplemental Agreement, and (2) committed an unfair labor practice in obtaining a modification of the Local Cartage Steel Rider through the tactics resorted to by defendants. However, while the *means* employed by the defendants to obtain a modification of the compensation agreement were highly improper, the fact that the defendants employed such improper means does not establish that the defendants violated the Hobbs Act. The means employed by the striking workers in *Enmons* to obtain a more favorable compensation agreement—physical violence itself—were obviously improper and illegal, and yet the Supreme Court found that the actions of the defendants in *Enmons* did not constitute a violation of the Hobbs Act since the defendants' objective was legitimate. The objective of management in the present case—reduction of its labor costs in the form of lower wages—is just as legitimate an *objective* as was the objective of labor in the *Enmons* case—increased labor costs in the form of higher wages. While the use of wrongful means in both *Enmons* and the present case is deplorable, the use of the wrongful means does not by itself constitute a violation of the Hobbs Act.

The foregoing conclusion is buttressed by the same factors which the Supreme Court considered in *Enmons*. First, I am unable to find any reported cases, with the exception of this Circuit's recent decision in *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981), in which the Hobbs Act has been applied to the fact pattern found in the present case, *i.e.,* to an employer who obtains a modification of a collective bargaining agreement by threatening his employees with economic loss.

Second, the Hobbs Act is a criminal statute and must, therefore, be strictly construed. Any ambiguity in that statute must be resolved in favor of lenity. *United States v. Enmons,* 410 U.S. at 411, 93 S.Ct. at 1015. It is not at all clear, in light of the legislative history of the Hobbs Act and the Supreme Court's interpretation of the Act, that the Act sweeps within its coverage the labor-management activities involved in this case. *Enmons* directs this Court to resolve this ambiguity in favor of a finding that the present factual pattern does not constitute a violation of the Hobbs Act.

Finally, I am unable to find anything in the Act's history or its language which could justify the conclusion that Congress intended to create extraordinary changes in federal labor law when it enacted the Hobbs Act. Congress has carefully and comprehensively regulated the field of labor-management relations and has provided specific means and penalties for the enforcement of collective bargaining agreements and for the prevention of unfair labor practices. The majority opinion today makes conduct—improper mid-term changes in a collective bargaining agreement—which is expressly covered by provisions of the National Labor Management Relations Act containing noncriminal penalties into a federal crime with severe penalties. I question whether Congress "intended to work such an extraordinary change in federal labor law." *Enmons,* 410 U.S. at 411, 93 S.Ct. at 1015.

## IV.

The majority opinion places the present case outside the scope of *Enmons* on the ground that the company had "no legitimate claim" to the drivers' reduced compensation for the purpose of meeting its obligations to the welfare and pension funds because the existing contracts expressly required the company to make those payments out of its own funds.

In *Enmons,* the Supreme Court repeatedly referred to "legitimate" union objectives, "legitimate" labor ends and "lawful" claims to property. It is the interpretation of such language that presents the central issue in the present case.

In my view, management in the present case had a "legitimate" management *objective* in seeking a reduction of its labor costs by a mid-term modification of the collective

bargaining agreement. As a result of that modification, the company's expenditures for drivers' compensation were reduced and, as to the money saved under the modified agreement, the company certainly had a "lawful" claim.[13] What may well have been "unlawful" and not "legitimate" were the *means* used by management to obtain that objective, and it is here that the majority makes its second effort to distinguish *Enmons.*

The majority points out,

[m]oreover, the provision requiring the Company to make payments to the pension and welfare funds was, as stated, contained in the collective bargaining agreement, and yet the agreement to shift this burden to the drivers did not result from collective bargaining. It is true that co-defendant and appellant Smith, the business agent for the local, signed the agreement, but this was done after it had been individually signed by the drivers as a result of individual negotiation with and pressure on them by representatives of the Company.

Accepting all of this as true and considering it in the light most favorable to the Government, the conduct of the company's representatives in attempting to bypass the union and deal directly with the drivers may well have been an unfair labor practice; the modification of the compensation agreement may well have been a breach of the welfare and pension payment agreement; and certainly the use of misrepresentations and threats of economic loss in the implementation of management's efforts to change the compensation agreement are not only despicable tactics but could be in violation of other federal or local statutes. Indeed, it may be assumed that the modified agreement itself was unenforceable and that the drivers have the right to recover every dollar to which they were entitled under the original collective bargaining agreement. It does not follow, however, that the conduct of the defendants in obtaining a modification of the compensation agreement was a violation of the Hobbs Act. Under the reasoning of the *Enmons* decision and for the reasons previously stated, I do not believe that it was. The conduct in question may be assumed to be "unlawful" in the very same manner that the use of the extreme violence in *Enmons* to obtain a favorable bargaining agreement was clearly "unlawful," but as the Supreme Court has construed the Hobbs Act, the test of its application does not depend on the legality of the means used to obtain a labor or management objective but only on the legitimacy of that objective.

The majority sees this case as being no different "had the drivers, as a result of threats of economic loss, been forced to take money out of their pockets and pay it over to the Company to be used to satisfy the Company's legal obligation to the pension and welfare funds." In the sense that any reduction in compensation is "money out of their pockets," the analogy is accurate. What the company did with the money it saved is of little, if any, significance; it may or may not have used it to pay its debt to the union funds or for some other corporate purpose. However, the objective of the company—a reduction of its labor

---

**13.** Judge Martin in his concurring opinion concludes that the company's objective of "shifting of responsibility for welfare and pension fund payments to the employees" was not a legitimate management objective. The objective of the company in this case—to obtain a reduction in the drivers' compensation in order to offset the company's cost of its contributions to the health and welfare and pension plans— seems to me to be a legitimate management objective. Even conceding that the company's efforts in the present case had the effect of shifting the responsibility for the fund payments to the employees and constituted a patent violation of the collective bargaining agreement, the "objective," in the context of the *Enmons* case, was legitimate, and neither the resulting breach of contract nor the parties' own characterization of such a breach as "unlawful" or "illegal" changes a legitimate management objective into an illegitimate one. One of the problems of the majority decision, in my view, is its reliance upon language in a collective bargaining agreement and the breach of that agreement as a basis for finding no legitimate management goal and therefore a Hobbs Act violation—a rationale that injects the spectre of severe criminal sanctions into the resolution of labor-management disputes. Part V, *infra.*

costs—remains, it seems to me, a legitimate objective of management. In *Enmons,* management, as a result of the violent activity of the employees, may well have been forced to take money out of the company's "pockets" and pay it to the employees to satisfy the employees' demands for higher wages. The *means* used by the company representatives in the present case (fear of economic loss) and the *means* used by the employees in *Enmons* (outright violence) are both to be condemned, but the Hobbs Act was not intended to control or make criminal the means used to achieve legitimate goals of management or labor.

Finally, the majority also suggests that the present case is not a "labor case" and that, accordingly, the *Enmons* exception to the application of the Hobbs Act does not apply. I recognize that *Enmons* "is a labor case" and that "any application of *Enmons* to cases outside of that context must be done with caution." *United States v. Cerilli,* 603 F.2d 415, 419 (3d Cir.1979). However, the present case *is,* in my opinion, a "labor case." The majority opinion correctly states that the undisputed facts show that the drivers presented management with a list of grievances, including an insistence that management comply with its obligation under the current collective bargaining agreement to pay contributions to the employees' health and welfare and pension plans. Undeniably a "labor dispute" existed in the present case, and that dispute, like the dispute in *Enmons,* involved the terms and conditions of employment. It was while attempting to resolve the labor dispute and avoid a strike by the drivers by seeking concessions in the form of lower wages in return for management's fulfillment of its other contractual obligations that management, through the appellants, resorted to wrongful means. While caution should be exercised in extending *Enmons* too far—especially to cases outside the labor context—equal, if not greater, caution should be exercised in *not* applying *Enmons* to cases such as ours which *do* involve labor disputes.

Neither of the two cases relied upon by the majority for its position that the case *sub judice* is not a "labor case" dealt with a fact pattern similar to the one before us. Although Count I in *United States v. Quinn,* 514 F.2d 1250 (5th Cir.1975), involved actions taken in response to a labor dispute, the defendant in that case was not an employee or agent of the employer. Instead the defendant was a nonemployee who volunteered to represent the striking employees and who illegally received money from the employer while acting as the employees' representative. This receipt of money was a criminal offense under 29 U.S.C. § 186(a), and the defendant had no lawful claim to the receipt of the money. Additionally, as noted in the concurring opinion in that case, the payment could have been considered a personal payoff, clearly not a legitimate labor objective as numerous cases have held. *United States v. Quinn,* 514 F.2d at 1268. It is clear that the *Quinn* case fell within the scope of the Hobbs Act because the defendant's objective was itself unlawful.

The other decision cited in Part III of the majority opinion, *United States v. Cerilli,* 603 F.2d 415 (3d Cir.1979), did not involve any labor dispute. Instead, *Cerilli* involved coerced political contributions from the lessors of equipment seeking contracts with a state agency.

## V.

The broad interpretation of the Hobbs Act impliedly given by the panel in *Cusmano* and expressly given by the majority in the present case in its application to the resolution of disputes between an employer and its employees dealing with terms and conditions of employment is troublesome. Although I strongly condemn the tactics of the defendants in the present case, I am fearful of the ramifications of such an interpretation to both management and labor.

The thrust of the majority decision is that *Enmons* does not apply because the employer in the present case, already contractually bound to pay the agreed upon compensation and contributions to the union funds, had no legitimate objective in seeking a reduc-

tion in the drivers' compensation. However, many employers who are contractually bound by collective bargaining agreements may well attempt, due to changed economic conditions, unexpected reversals in the employer's business and other reasons, to seek a reduction in their labor costs. Such efforts may well be accompanied by threats of economic loss to the employees, *e.g.,* the threat of closing the plant or moving it to a lower labor cost region or going out of business altogether, if reduced labor costs are not agreed upon.

I see little, if any, difference between the present case and one in which the management of a company that has suffered severe financial loss attempts, without success, to have its employees by vote reduce their contract wages and, having failed in this attempt, then tells its employees that unless they agree to management's requested reduction the company will shut down its operation and lay off all its employees. As I understand the majority opinion, if management in such a situation makes that threat to the union representative it would be considered in the context of a collective bargaining negotiation and, therefore, it would not be a violation of the Hobbs Act. However, if management makes the identical threat to any of its employees it would be a violation of the Hobbs Act and a criminal offense. In my view, the Hobbs Act should not be construed to convert what might be an unfair labor practice into a severe criminal offense involving a possible term of imprisonment of twenty years.

If the Hobbs Act is construed in the manner adopted by the majority, the resulting Damoclean sword would hang as much over the head of labor as it would over the head of management. If, in the present case, the contract had exempted the company from making contributions to the benefit funds, but the employees, disgruntled by the exemption, threatened to strike if the employer did not make such benefit payments, then under the rationale of the majority opinion I assume the employees would be guilty of a Hobbs Act violation on the theory that they have no "legitimate" claim to those increased benefits. Similar-

ly, under the majority rationale, employees would be guilty of this criminal offense whenever a wildcat strike occurs as a result of the employees demanding more than the employer is contractually obligated to provide. Even more troublesome would be those cases in which ambiguous contract language makes it difficult to discern whether the employees' or employer's demands for concessions are "legitimate" or "not legitimate." The spectre of a possible federal grand jury indictment would be present in all such cases and would be an unwarranted and unwelcome intruder in the resolution of industrial disputes between an employer and its employees over the terms and conditions of employment.

## VI.

While I believe that Congress did not intend the Hobbs Act to apply to factual patterns such as the one before this panel, this very issue has previously been addressed and silently determined by another panel of this Circuit. The majority opinion correctly notes that the question of the sufficiency of the indictment and the evidence involved in this case to establish a violation of the Hobbs Act was briefed and presented to the panel of this circuit which decided *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981). I agree with the majority's position that the *Cusmano* panel implicitly decided that the indictment involved in this case states a violation of the Hobbs Act when that panel remanded the *Cusmano* case for a new trial. It is also clear that the *Cusmano* panel implicitly decided that the evidence in that case was sufficient to sustain a conviction under the Hobbs Act.

While it is true that questions neither brought to the attention of the court nor ruled upon are not to be considered as having been so decided as to constitute precedents, *Webster v. Fall,* 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411 (1925); *Soyka v. Alldredge,* 481 F.2d 303 (3d Cir.1973), it is equally true that where an issue is implicitly decided because it was necessary to resolve that issue in order to reach the result

of the decision, the implicit decision is treated as precedential authority. *Popeko v. United States*, 513 F.2d 771, 773 (5th Cir. 1975). Thus, the implied decision in *Cusmano* must be treated as precedential authority. The question remaining, however, is to what extent the *Cusmano* panel's decision controls the decision of the present panel.

Most of the United States Courts of Appeals follow the rule that one panel of a circuit court may not overrule the decision of another panel; only the Court of Appeals sitting *en banc* may overrule the decision of a panel. *E.g., Popeko v. United States*, 513 F.2d 771 (5th Cir.1975); *United States v. Mount*, 438 F.2d 1072 (9th Cir.1970). The case law in the Sixth Circuit, however, appears to be inconsistent on the question of whether this rule is followed in this circuit. In *Timmreck v. United States*, 577 F.2d 372 (6th Cir.1978), *rev'd on other grounds*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), the opinion of the panel states, "[o]ne panel of this Court cannot overrule the decision of another panel; only the Court sitting en banc can overrule a prior decision." 577 F.2d at 376 n. 15. However, in *Speigner v. Jago*, 603 F.2d 1208 (6th Cir.1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980), Judge Peck states that "there is no rule in this Circuit which requires an en banc hearing to overrule a decision of a three-judge panel. Further, such a requirement has not been followed in practice by this Court." 603 F.2d at 1212 n. 4. While Judge Peck spoke only for himself on this issue since Chief Judge Edwards concurred separately, not finding it necessary to overrule the precedent in question, and Judge Weick dissented, he correctly noted that in practice the Sixth Circuit has not always followed the rule that one panel may not overrule an earlier decision. *See, e.g., United States v. Bess*, 593 F.2d 749 (6th Cir.1979); *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974).

In my opinion, the position adopted in *Timmreck* is the better rule since it should lead to consistency in panel decisions and would discourage unwarranted appeals. Thus, in the present case I feel this panel is bound by the decision of the *Cusmano* panel on the question of the sufficiency of the indictment and evidence since there are no facts in this case which would allow the *Cusmano* decision to be meaningfully distinguished.

Based on the rule adopted in *Timmreck* that a later panel may not overrule the decision of an earlier panel, and in light of the fact that the *Cusmano* panel implicitly decided the issues before this panel, I reluctantly concur in the result reached by the majority.