UNITED STATES of America,
Plaintiff,

v.

Jay CAMPBELL and Donny
Douglas, Defendants.

No. 02–80863.

United States District Court,
E.D. Michigan.
Southern Division.

Oct. 21, 2003.

Peter J. Kelley, Ann Arbor, MI, Laurence C. Burgess, Detroit, MI, Harold Z. Gurewitz, Southfield, MI, Harold Z. Gurewitz, Gurewitz & Raben, Detroit, MI, for Defendants.

## ORDER AND OPINION GRANTING DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

EDMUNDS, District Judge.

This matter came before the Court on Defendants' motion to dismiss the three-count indictment against them. Defendants, union officials, are charged with violating various criminal statutes arising out of their actions during labor negotiations with the General Motors' truck plant in Pontiac, Michigan. The indictment fails to allege criminal offenses against the United States, and therefore Defendants' motion is GRANTED.

## I. Facts

### A. The Agreements

United Auto Workers ("UAW") Local 594 represents over 5,000 production and skilled trades employees at General Motors' Pontiac truck facilities ("Pontiac Truck"). The National Agreement between General Motors and the International UAW, as well as the Local Agreement between Pontiac Truck and Local 594, determine the terms of employment for Pontiac Truck employees. After General Motors and the International UAW execute the National Agreement, the management of Pontiac Truck and Local 594 officials negotiate the Local Agreement. The local negotiators on both sides do not have the authority to amend or alter the terms of the National Agreement. Additionally, the UAW Constitution states that no official or member "shall have the power or authority to counsel, cause, initiate, participate in, or ratify any action which constitutes a breach of any contract entered into by a Local Union or by the International Union or by a subordinate body thereof."

### B. Skilled Trades Positions

The National Agreement provides that employees may receive the designation of "skilled tradesman" and bid upon various "skilled trade positions." The positions pay in excess of $100,000 per year. The National Agreement provides various education and training requirements for skilled tradesman. Many General Motors employees meet these requirements, but have not yet received a skilled trades position. The National Agreement and a Memorandum of Understanding between General Motors and the International UAW specify the hiring preference system at Pontiac Truck when skilled positions become available. That hierarchy begins with laid-off skilled trades employees, and continues through current General Motors employees who are qualified under the National Agreement, other current General Motors employees, and so forth. Outside applicants who do not meet the require-

ments in the National Agreement are accorded no preference.

### C. Defendants' Alleged Actions

From 1995 to 1997, Defendants served as officials of Local 594 and were its chief negotiators with Pontiac Truck over several local agreements and memoranda. During that period, the government alleges that Defendants demanded that Pontiac Truck hire Gordon Campbell, son of Defendant Jay Campbell, and Todd Fante, nephew and son-in-law of former Local 594 officials, into skilled trade positions. Neither Campbell nor Fante were employees of Pontiac Truck or General Motors, and neither were qualified under the National Agreement to be skilled tradesmen. General Motors and UAW officials refused the demand and informed Defendants that Campbell and Fante were not qualified for the positions and that hiring them into the positions would violate the National Agreement and Memorandum of Understanding.

In 1996, General Motors and the International UAW reached a new three-year National Agreement. Local 594 and Pontiac Truck then began negotiations for their local agreement. The government alleges that Defendants again demanded that Pontiac Truck hire Campbell and Fante as skilled tradesmen.

In April 1997, Local 594 began a strike at Pontiac Truck. The government contends that by July 1997, all the issues of the strike had been settled except for the demand that Pontiac Truck hire Campbell and Fante. The government further contends that to avoid the continuation of the strike, General Motors agreed to hire Campbell and Fante into skilled trade positions.

The government also alleges that during the ratification of the new contract, Defendants actively concealed General Motors' promise to hire Campbell and Fante from Local 594 membership. Furthermore, the government alleges that Defendants actively concealed that Fante and Campbell were not qualified for the positions from Local 594 membership, and Defendants dismissed grievances by Local 594 members complaining of the hiring of Campbell and Fante, grievances which Defendants knew had merit.

On September 25, 2002, Defendants were indicted in a three-count indictment.[1] Count One alleges that Defendants violated 18 U.S.C. § 371—conspiring to violate the Labor–Management Relations Act. The indictment identifies the objects of the conspiracy as (1) the authority to amend the terms of the National Agreements, the Addenda, and Memoranda of Understanding; and (2) the employment and skilled trades designation for Gordon Campbell and Todd Fante. Count Two alleges that Defendants violated 18 U.S.C. § 1951—conspiracy to extort. The objects of the conspiracy were jobs for Fante and Campbell. Count Three alleges that Defendants violated 18 U.S.C. § § 1341, 1346 and 2—mail fraud and aiding and abetting. Count Three alleges that Defendants used a scheme and artifice to defraud members of Local 594 of their contractual right to obtain skilled trades positions and the honest services of Defendants.

### II. Analysis

Defendants move to dismiss all counts of the indictment for two reasons: the indictment fails to allege offenses and it is preempted by federal labor law. The Court finds the indictment does not allege

---

1. William Coffey was also indicted, but the charges were later dismissed after he passed away.

offenses against the United States and should therefore be dismissed. Accordingly, the Court need not reach the preemption issue.[2]

■ At the outset, the Court notes that the rule of lenity appropriately colors the following analysis. The doctrine of lenity sets boundaries prohibiting the expansion of criminal statutes by means of defining essential terms or elements of wrongful conduct to include "constructive" offenses or offenses clearly not intended by Congress. A criminal statute must be strictly construed, *U.S. v. Emmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), and constructive offenses should be avoided, *McNally v. U.S.,* 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In this case, the indictment is only sufficient if the Court were to create numerous constructive offenses.

### A.  Count One

■ Count One of the indictment charges Defendants with conspiring to commit offenses against the United States in violation of 18 U.S.C. § 371, which makes criminal a conspiracy to commit a crime against the United States or to defraud the United States. Count One identifies 29 U.S.C. § 186(a)(1), § 186(b)(1), and § 186(d)(2) as the specific offense Defendants conspired to commit. Section 186(a) provides that "it shall be unlawful for an employer to pay or deliver, or to agree to pay or deliver any money or other thing of value to any representative of any

of his employees who are employed in an industry affecting commerce." Section 186(b)(1) makes it unlawful "for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan or delivery of any money or other thing of value prohibited by subsection (a) of this section." Thus, in order to violate these sections, Defendants must have conspired to demand some "thing of value." Defendants argue that neither the authority to amend the National Agreement nor the procurement of jobs for third parties are things of value under the statute.

### 1.  The Authority to Amend the National Agreement

Count One alleges that one object of the conspiracy was to demand and receive, or to agree to demand and receive, "a thing of value," alleged to be "the authority to amend the terms of the National Agreements between GM and the UAW." Defendants contend that such authority is merely illusory because under no circumstances could Defendants exercise the authority. The National Agreement, as well as the UAW Constitution, prohibit local representatives from attempting to amend a National Agreement. Moreover, the UAW Constitution, Article 19 prohibits representatives of any local union from causing any breach of contract. Therefore, Defendants conclude that any purported amendment by a local union of the National Agreement would be unenforceable, and even if the authority could be obtained from General

2.  The Court notes, however, that the weight of authority is against a finding of preemption in this case. *See United States v. Boffa,* 688 F.2d 919 (3rd Cir.1982) (holding that *Garmon* preemption does not apply to conflicts between federal labor laws and other federal laws); *Smith v. National Steel & Shipbuilding Co.,* 125 F.3d 751 (9th Cir.1997) (same); *United States v. International Brotherhood of Teamsters,* 948 F.2d 98, 105 (2d Cir.1991) (same);

*United States v. Palumbo Bros., Inc.,* 145 F.3d 850, 862 (7th Cir.1998) (holding that *Garmon* does not apply to federal criminal statutes); *Hospital Employees' Div. of Local 79 v. Mercy–Memorial Hospital,* 862 F.2d 606, 607–608 (6th Cir.1988), *vac'd on other grounds,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989) (holding that violations of § 186 of the Taft–Hartley Act are intended to supplement the NLRA, and not be preempted by it).

Motors in contravention of the National Agreement, the result would be a breach and a violation of the contract. Hence, Defendants contend that the grant of authority to amend the National Agreement was invalid and unenforceable, and such an agreement cannot be a "thing of value." The government admits that once the National Agreement has been executed, Defendants as negotiators for Local 594 may not deviate, renegotiate, or amend in any way. (Resp. Br. at 13.)

In deciding what "things of value" are in criminal statutes, courts include intangibles. *United States v. Schwartz,* 785 F.2d 673, 680 (9th Cir.1986). Nevertheless, even an intangible must have some value, and an agreement which could never be acted upon is not valuable to anyone. Therefore, the agreement to amend the National Agreement is not a thing of value.

### 2. The Jobs

Defendants also argue that § 186's prohibition against "payment, loan, and delivery of money and things of value" did not prohibit Pontiac Truck from hiring Campbell and Fante as skilled tradesman for two reasons: (1) the statute does not prevent an employer from delivering or agreeing to deliver a thing of value to third parties, and (2) 29 U.S.C. § 186(c)(1) provides an exception that allows employers to provide compensation, i.e. wages, for actual services rendered.

Defendants' argue that the statute does not prohibit the delivery of things of value to third parties. 29 U.S.C. § 186(a) prohibits the an employer from paying or agreeing to pay any money or thing of value to (1) any representative of his employees; (2) any labor organizations or its officers; (3) any employee with the purpose of influencing other employees' right to collectively bargain. 29 U.S.C. § 186(b) makes it unlawful for any person to re-

quest, receive, or accept any payment prohibited by subsection (a). The plain language of the statute makes clear that the recipient of the money or thing of value must be Defendants.

The government points out that the Fourth Circuit has allowed payments to third parties to constitute the basis of a § 186 conviction based on the fiction that the "thing of value" was the demand and agreement that the employer pay the third party, and the defendant did receive that thing of value even if he did not receive the monetary payments. *United States v. DeBrouse,* 652 F.2d 383, 388 (4th Cir. 1981). Despite the government's desire for this Court to separate the agreement from the payments in this case, the essence of this part of Count One is the allegation that General Motors paid a thing of value (wages) to Fante and Campbell, not Defendants. Defendants may not be liable for a violation of § 186 for the delivery of things of value to third parties when the statute only prohibits an employer from delivering a thing of value to a representative of his employees. Moreover, in *DeBrouse,* the defendants demanded payments for "ghost" employees, employees the employer did not want and whom did not provide any services in exchange for wages. The defendants simply demanded that payoffs be made to the "ghost" employees instead of themselves. Here, by contrast, the indictment does not allege that Pontiac Truck did not receive the services for which it paid Fante and Campbell. This difference between actual and "ghost" employees strengthens the conclusion that Defendants should not be liable for payments to Campbell and Fante. They were actual employees paid for their services by General Motors, not merely persons to whom General Motors made personal payoff payments instead of

to Defendants. Therefore, Count One is dismissed.

### B. Count Two

■ Count Two charges Defendants with unlawfully conspiring to obstruct, delay and affect commerce in violation of 18 U.S.C. § 1951 ("the Hobbs Act") through extortion, having obtained employment wages and benefits for Gordon Campbell and Todd Fante by Inducing General Motors through the wrongful use of fear of economic harm. Count Two fails because it does not allege an illegitimate objective.

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear .…" 18 U.S.C. § 1951(b)(2). *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) largely controls the disposition of this issue. In *Enmons*, the defendants were members and officials of a labor union who were charged with the use of actual force, violence, and fear of economic injury in order to force a company to agree to a contract with the union, which called for higher wages and other monetary benefits. *Id.* at 397, 93 S.Ct. 1007. The defendants were charged with committing five acts of physical violence in order to coerce the company to sign the contract. *Id.* at 398, 93 S.Ct. 1007. The lower court dismissed the indictment because the defendants' alleged use of force was to obtain legitimate union objectives, and the government appealed to the Supreme Court.[3] *Id.* The Court decided that the Hobbs Act is limited

> to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property. Con-

strued in this fashion, the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoff, and where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers.

*Id.* at 400, 93 S.Ct. 1007. The Court held that when force is used to obtain legitimate union demands, such as higher wages, the Hobbs Act does not apply. *Id.* at 410, 93 S.Ct. 1007.

Generally, negotiating for additional jobs is a legitimate labor objective. 29 U.S.C. § 158(b)(6) makes it an unfair labor practice only to cause an employer to pay a thing of value "for services which are not performed or not to be performed," implying that it is not necessarily an unfair labor practice to cause an employer to pay for services which were actually performed or intended to be performed. Indeed, the Supreme Court has decided that § 158(b)(6) does not prevent a union from negotiating for positions that are arguably unneeded by the employer in order to create more jobs for union members: "Where the work is done by an employee, with the employer's consent, a labor organization's demand that the employee be compensated for time spent doing the disputed work does not become an unfair labor practice." *Am. Newspaper Ass'n v. NLRB*, 345 U.S. 100, 110, 73 S.Ct. 552, 97 L.Ed. 852 (1953). Thus, Defendants' bargaining demand for additional skilled trades positions, even if otherwise unwanted by General Motors, is not an illegitimate bargaining objective and falls within the *Enmons* exception.

---

3. The procedural rules in effect at the time permitted a direct appeal to the Supreme Court.

The government contends that while generally this may be true, in this case the additional positions for Campbell and Fante violated the then existing contracts between General Motors and Local 594, and therefore the objective was unlawful. The government cites two Sixth Circuit decisions for the proposition that bargaining demands that violate the National Agreement, the Memorandum of Understanding, and the UAW Constitution are wrongful and do not fall under the *Enmons* exception.

In *United States v. Russo*, 708 F.2d 209 (6th Cir.1983), the defendants were employers who, by threats of economic loss, convinced employee truck drivers to pay an eleven percent "service charge" to the company, so that the company could meet its obligations under the collective bargaining agreement. The defendants convinced the drivers in individual meetings after the proposal was overwhelmingly rejected at a general meeting between management and employees. *Id.* at 212. Defendants were charged, tried, and convicted of violating the Hobbs Act and conspiring to violate the Hobbs Act. *Id.* at 209. On appeal, the defendants argued, *inter alia*, that *Enmons* required the district court to dismiss the charges because their goal was "to increase the employer share of the profits from the operation of the Company," and that goal was not wrongful. *Id.* at 215. The Sixth Circuit rejected their argument because the company for which the defendants acted did not have a legitimate claim to the eleven percent "service charge." The company did not have a legitimate claim to the additional charge because the collective bargaining agreement expressly prohibited the company from deducting welfare and pension benefits from the drivers' earnings. *Id.* at 215. The Sixth Circuit reached the same conclusion in a case brought by a co-defendant of *Russo*, but who had been tried separately and brought a separate appeal. *See United States v. Cusmano*, 729 F.2d 380 (6th Cir.1984).

Those cases are distinguishable, however, because the employer made its demands on individual employees to pay extra fees to the employer, to which the employer was not entitled under the existing contract and which the membership collectively rejected. Here, Defendants' alleged demands were made in the course of negotiating the new local collective bargaining agreement which, if the parties reached an agreement, could have provided for the two positions, and thus the positions would not have been in violation of at least one of the governing contracts. Whether or not the inclusion of that provision in the new agreement between Pontiac Truck and Local 594 would have violated other contractual provisions between the UAW and General Motors should not be the basis of a criminal charge of extortion—that is an issue to be resolved between the UAW, Local 594, General Motors and Pontiac Truck through the established labor relations' dispute framework.

Therefore, the indictment does not allege that Defendants' demands were for illegitimate objectives and Count Two of the indictment falls to allege an offense against the United States.

## C. Count Three

Count Three of the indictment charges Defendants with mail fraud in violation of 18 U.S.C. §§ 1341, 1346 and 2. Specifically, paragraph six charges Defendants with defrauding members of Local 594 of

(a) property consisting of the contractual right to obtain the skilled trades and/or journeyman designation;

(b) property consisting of the skilled trades and/or journeyman designation and employment for two undetermined General

Motors employees who were either qualified or could become qualified for such designation and employment including the associated wages and benefits; and

(c) the honest services of the Defendants, which they owed to Local 594 members.

Defendants contend that neither the property allegations nor the honest services allegation are sufficient to support an indictment for mail fraud.

### 1. The Property

■ Defendants argue that the possibility of employment, or even actual employment which is subject to termination without cause by General Motors, is not "property" under the mail fraud statute.

Defendants rely on *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), where the Court held that unissued government licenses are not property. Similarly, Defendants rely on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) for the rule that at-will employment is not a property right. The National Agreement provides that employees are "temporary" during their first ninety days of employment. During their first thirty days, employees may be terminated for any cause without the right to grieve. For the remaining sixty days, the employee may file a grievance only if his layoff or discharge is not for cause.

The government responds with two arguments: the collective bargaining agreements created a contractual right in the members of Local 594 for the skilled trades jobs, and the Local 594 members they intend to produce at trial, from whom the government alleges the jobs were taken, were already employees of General Motors for a sufficient time so that they would not have been temporary employees.

Other circuit courts have held that wages and other financial benefits guaranteed by collective bargaining agreements are sufficient to constitute property for a mail fraud conviction. *See United States v. Palumbo Bros., Inc.,* 145 F.3d 850, 873 n. 3 (7th Cir.1998); *United States v. Boffa,* 688 F.2d 919, 930 (3rd Cir.1982). In this case, however, the bargaining agreements, at most, guaranteed the membership the right to compete for skilled trades positions before any outside hires were considered for the positions. The government is stretching too far—scheming to deny membership the right to compete for a job does not reach the level of scheming to deny membership wages which were promised in the agreements. The right to compete for a job does not constitute "property." Therefore, this part of Count Three is dismissed.

### 2. Honest Services

In addition to the "property" alleged above, Count Three also indicts Defendants for intending to defraud the members of Local 594 of "[t]he honest services of defendants owed to Local 594 members pursuant to Article 19, of the UAW Constitution, Section 501(a) of the LMRDA, and the defendants' duty to faithfully and fairly represent the members of Local 594 as labor representatives." The mail fraud scheme is alleged to be in violation of 18 U.S.C. § 1346, which explicitly includes "a scheme or artifice to deprive another of the intangible right of honest services." Congress passed § 1346 in response to the Supreme Court's decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Court held that the mail fraud statute did not include schemes to defraud others of

honest services. *See United States v. Frost*, 125 F.3d 346, 364 (6th Cir.1997).

■ The Sixth Circuit has established the following contours of a fraud conviction based on the honest services doctrine:

Unlike a defendant accused of scheming to defraud another of money or property, a defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim. Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim.

*Frost*, 125 F.3d at 369. The *Frost* court also decided that the honest services doctrine may be applied against not only public officials but actors in the private sphere so long as a fiduciary duty exists. *Id.* at 366. Moreover, "[p]roof that the employer simply suffered only the loss of the loyalty and fidelity of the defendant is insufficient to convict." *Id.* at 368. Accordingly, in order to be convicted under the honest services doctrine, (1) Defendants must have had a fiduciary duty to the membership of Local 594, (2) they must have intended to breach their fiduciary duty, and (3) they should have reasonably foreseen that the breach would create an economic risk to the membership of Local 594.

■ Paragraph 6(c) of Count Three alleges three separate sources of Defendants' fiduciary duty to members of Local 594:(1) the UAW Constitution; (2) Section 501(a) of the LMRDA, which prescribes five separate duties upon union officials and employees; and (3) the duty of fair representation incumbent upon all union officials. As to the UAW Constitution, the indictment cites two sections as sources for Defendants' fiduciary duty: Article 19, Section 1, which prohibits UAW representatives from causing, participating in, or ratifying actions constituting breaches of labor agreements; and Article 19, Section 3, which requires UAW representatives to submit proposed contracts with the employer to the membership of the local union for ratification. Breach of the UAW Constitution may provide the basis for an honest services fraud conviction, *United States v. DeFries*, 129 F.3d 1293, 1304–05 (D.C.Cir.1997), and a union representative may violate their duty of fair representation by submitting a contract for ratification vote without providing the membership with relevant information, *Brown v. IBEW Local No. 58*, 936 F.2d 251 (6th Cir.1991). Therefore, it seems that the UAW Constitution may create a fiduciary duty in Defendants.

Regarding § 501(a) of the LMRDA, the Sixth Circuit has found that it may impose a general fiduciary duty on union officials. *Corea v. Welo*, 937 F.2d 1132, 1144 (6th Cir.1991). *See also DeFries*, 129 F.3d at 1304–05. Section 501(a) provides: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group." In *Boffa*, the Third Circuit decided that § 501(a) established "union members' right to the honest and faithful services of union officials." 688 F.2d at 931. Furthermore, even if that is the sole source of such a right, "a scheme to defraud employees of the loyal, faithful, and honest services of their union official alleges a crime within the scope of the mail fraud statute." *Id.* In sum, the UAW Constitution and 29 U.S.C. § 501(a) establish Defendants' fiduciary duty to local 594 members, and a scheme to defraud union members of the honest and faithful services of their union representatives is sufficient to sustain a mail fraud conviction.

Though the indictment is sufficient to establish Defendants' fiduciary duty to the

local membership, it is insufficient to establish the third element of a breach of honest services allegation, that is Defendants should have reasonably foreseen that the breach would create an economic risk to the membership of Local 594. The indictment alleges that Defendants deprived the local membership of their honest services by submitting a misleading contract for the membership's ratification and by withdrawing all grievances filed by local members regarding the hiring of Campbell and Fante. The indictment does not allege that a misleading contract, or withdrawn grievances, put the local membership at economic risk or that Defendants should have reasonably foreseen that it would have. Moreover, these allegations are essentially allegations of unfair labor practices, which should not result in criminal liability. *See Boffa*, 688 F.2d at 928 ("To permit mail fraud prosecutions grounded on unfair labor practices would be to impose criminal penalties for conduct that, until now, has been remediable solely under the NLRA").

In addition to depriving the local membership of their honest services, Count Three also accuses Defendants of violating their duty to faithfully and fairly represent the members of Local 594. This Court is unaware of any criminal conviction based on a defendant's violation of his duty to faithfully and fairly represent local membership, and the Court declines to create such a basis for an indictment here.

In sum, this indictment attempts to criminalize behavior that is the subject of extensive civil legislation and which has not previously been construed as criminal. Therefore, the Court finds that the indictment fails to sufficiently allege criminal behavior.

### III. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendants' motion to dismiss the indictment for failure to state a claim is GRANTED; and the indictment against Jay Campbell and Donny Douglas is hereby DISMISSED.